**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **ALARM DETECTION SYSTEMS, INC., an Illinois corporation; ILLINOIS ALARM SERVICE, INC., an Illinois corporation; D.M.C. SECURITY SERVICES, INC., a Illinois corporation; NITECH FIRE & SECURITY INDUSTRIES, INC., an Illinois corporation; SMG SECURITY SYSTEMS, INC., an Illinois corporation; and ACADIAN MONITORING SERVICES, LLC, a Louisiana limited liability corporation,** | ) ) ) ) ) ) ) ) ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **No.  17 C 2153** |
| **THE VILLAGE OF SCHAUMBURG, a municipal corporation; TYCO INTEGRATED SECURITY LLC, a Delaware limited liability company; and NORTHWEST CENTRAL DISPATCH SYSTEM, an intergovernmental cooperation association** | ) ) ) ) ) ) | **Judge Rebecca R. Pallmeyer** |
| **Defendants.** | ) ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs are companies licensed under the Illinois Private Detective, Private Alarm, Private Security, and Locksmith Act of 2004, 225 ILCS § 447/5-5 *et seq.* ("Alarm Act").  (Verified Compl. [1] ¶¶ 32–37.)  Pursuant to these licenses, Plaintiffs operate what are known as "central stations," which monitor fire alarm signals in commercial and multifamily buildings and relay those signals to an emergency dispatcher, in this case, Defendant Northwest Central Dispatch System ("NWCDS").  In addition to dispatching emergency services in response to signals from central stations, Defendant NWCDS also has the capacity to monitor fire alarm signals directly from these buildings.  In 2011, NWCDS entered into an agreement with Defendant Tyco Integrated Security, LLC ("Tyco"), in which Tyco agreed to operate NWCDS's own fire alarm monitoring station, known as a "remote supervising station."[1]  Building owners pay their desired

---

[1]      It is not clear why the stations are described as "central" or "remote."  The court assumes that "central" stations are so named because they are centralized monitoring facilities

fire alarm monitor an ongoing fee for monitoring services; typically, they sign a contract with a particular monitoring company for a number of years, and fire alarm companies compete with one another in the prices charged in those contracts. For several years, the NWCDS/Tyco remote supervising station competed in this manner with Plaintiffs' central stations. But in 2016, Defendant Village of Schaumburg ("the Village" or "Schaumburg") passed an ordinance [2] requiring most commercial and multifamily buildings to use NWCDS's remote supervising station by 2019.

Six months after the ordinance was passed, Plaintiffs brought this suit against the Village, NWCDS, and Tyco. They complain that the ordinance and the NWCDS/Tyco agreement gives Tyco a monopoly over alarm monitoring, and that Defendants illegally agreed to restrain trade and hinder competition. They also allege that Defendants have tortiously interfered with their existing contracts and prospective business; impaired their existing contracts in violation of the Contracts Clause; violated their due process and equal protection rights under the Fourteenth Amendment; and been unjustly enriched. Plaintiffs have moved for a preliminary injunction against enforcement of the ordinance. They claim an injunction is necessary because they have already begun losing business to Tyco. For the reasons stated below, the motion is denied.

## BACKGROUND

### I.    Factual Background

The facts of this case are presented in Plaintiffs' verified complaint, and are largely undisputed. *See Hunter v. Atchison, T. & S. F. Ry. Co.*, 188 F.2d 294, 298 (7th Cir. 1951) ("On the application for a temporary injunction the court may consider affidavits and verified

---

that receive signals from all over the country, while "remote" stations are remote from these centralized facilities. But both are located offsite from the commercial or multifamily building itself.

[2]    The Village purportedly passed the ordinance for safety reasons; there is no indication that NWCDS or Tyco were involved in its passage.

pleadings as evidence."); *cf. K-2 Ski Co. v. Head Ski Co.*, 467 F.2d 1087, 1088–89 (9th Cir. 1972) ("A verified complaint or supporting affidavits may afford the basis for a preliminary injunction; but if the facts so appearing consist largely of general assertions which are substantially controverted by counter-affidavits, a court should not grant such relief unless the moving party makes a further showing sufficient to demonstrate that he will probably succeed on the merits.") (internal citation omitted).

## A. Fire Alarm Monitoring Business in Schaumburg

Most commercial and multifamily buildings (referred to by the parties as "Commercial Accounts") are required by law to maintain a system for detecting and transmitting fire alarm signals. (Compl. ¶ 1.) These systems include smoke detectors and other devices that send signals to a fire alarm panel in the building, which collects signals from the building devices, and a transmission device which sends all signals[3] to an offsite[4] monitoring facility. (*Id.* at ¶ 8.) Three types of signals are transmitted by these systems: alarm signals, trouble signals, and supervisory signals. (*Id.* at ¶ 49.) Alarm signals indicate a possible fire, while trouble and supervisory signals indicate either system malfunctions or "activation of a monitored device," such as a sprinkler leak. (*Id.*; Transcript of Proceedings, Apr. 12, 2017 ("Transcript") [49] 6:1–4.) These systems are generally governed by the widely-recognized national fire code standards issued by the National Fire Protection Association. These standards are known as "NFPA 72,"[5] and Schaumburg has adopted them as its fire code. (Compl. ¶¶ 9, 47–48.)

---

[3] In 2012, Schaumburg passed an ordinance requiring that fire alarm systems transmit their signals wirelessly, as opposed to using phone lines. (Compl. ¶¶ 57, 63.)

[4] The court assumes that locating the monitoring facilities offsite ensures that the monitoring continues to function in the event of a fire at the Commercial Account.

[5] So far as the court can tell, these standards are called "NFPA 72" simply because NFPA has historically issued fire protection standards and codes in numerical order by subject. NFPA 10, for example, sets forth the "Standard for Portable Fire Extinguishers." *List of NFPA Codes & Standards*, NAT'L FIRE PROT. ASS'N, http://www.nfpa.org/codes-and-standards/all-codes-and-standards/list-of-codes-and-standards (last visited Aug. 24, 2017).

Plaintiffs operate what are called "central stations," which monitor these signals. (*Id.* at ¶¶ 1, 2, 56; Transcript 6:7–10.) When they receive alarm signals, operators at the central stations call the local dispatcher, in this case NWCDS, to dispatch emergency personnel. (Compl. ¶ 12.) Companies operating central stations can also monitor trouble and supervisory signals, and promptly fix any problems they identify. (*See id.* at ¶¶ 49–50.) Most of the Plaintiffs also sell or lease transmission devices directly to Commercial Accounts, in addition to operating central stations. (*See id.* at ¶¶ 1, 2, 21–22, 32–37, 50, 56.) Plaintiff Acadian, however, operates central stations, but does not sell or lease transmission devices (presumably, Commercial Accounts that transmit to Acadian's central stations acquire their transmission devices from other companies). (*See id.* at ¶¶ 1–2, 37, 51.)

As an alternative to central stations, Commercial Accounts may transmit signals to a "remote supervising station," which is a station operated by a governmental agency, as opposed to a private company. *NFPA 72: National Fire Alarm and Signaling Code* §§ 26.1, 26.3–26.5 (2010 ed.) [hereinafter *NFPA 72*] (cited by *ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.*, 672 F.3d 492, 500 (7th Cir. 2012). NFPA 72 by its terms permits a local fire protection system to consist of multiple central stations and a single remote supervising station.[6] The Seventh Circuit has determined that requiring signals to be transmitted to a remote supervising station, thus eliminating the central station option, is also NFPA-72-compliant. *See ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.*, 672 F.3d 492, 501 (7th Cir. 2012) (citing *NFPA 72* §§ 26.5.3.1.1–3 (2010 ed.)).[7]

---

[6] Because remote supervising stations are operated by government entities, Commercial Accounts that transmit to a remote supervising station must transmit to the one operated by their jurisdiction. Accordingly, while there can be multiple central stations serving one area, only one remote supervising station is usually available to a Commercial Account.

[7] The parties have provided only brief excerpts of NFPA 72, which do not include these cited sections. The court therefore cites to related litigation describing these provisions.

In 2016, the Village of Schaumburg did just that—it passed an ordinance requiring that fire alarm systems transmit signals directly to the Village's remote supervising station at NWCDS. (Ordinance 16-078, Ex. B to Compl. [1-1] (the "Ordinance") at § 4; Compl. ¶ 4.) In prefatory language, the Ordinance explains that this decision was prompted by the Village's "experience" with central station systems going "out of service[,] which endangers the health, safety[,] and welfare of the general public."[8] (Ordinance 16-078.) Under the new Ordinance, existing fire alarm systems must begin transmitting signals wirelessly to NWCDS on the first of three dates: (1) the date when their existing contract with a central station operator ends, (2) the date when their existing fire alarm equipment is modified or replaced, or (3) August 31, 2019. (*Id.* at § 4) The Ordinance allows for extension of this deadline beyond August 31, 2019 for a customer whose central station contract expires after that date, if the Village fire chief determines that public safety "is not affected," but the Ordinance does not allow for any extensions beyond August 31, 2021. (*Id.*) Commercial Accounts that do not comply with the ordinance are subject to fines and revocation of their fire alarm permit and business licenses. (Compl. ¶ 74.)

On its face, the Ordinance allows anyone to transmit signals to NWCDS; if Plaintiffs installed signal-receiving equipment at NWCDS, they could presumably continue serving their Commercial Accounts while complying with the Ordinance. The problem for Plaintiffs, however, is that in 2011, NWCDS had entered into an agreement with Tyco[9] where NWCDS granted Tyco "the exclusive right to install, own, maintain and service all alarm signal receiving and

---

[8]     Tyco has attached to its surreply a news article concerning the failure of thousands of transceivers installed in Plaintiff ADS's customers in fall 2016, after the Ordinance was passed. (Rodney Bosch, *Alarm Detection Systems Recovering From Catastrophic Network Failure*, SECURITYSALES.COM, Nov. 17, 2016, Ex. D to Tyco Surreply in Opp. to Pls.' Mot. for TRO and Prelim. Inj. [46-1].)

[9]     NWCDS signed the agreement with ADT Security Services, which Plaintiffs contends is "now known as Tyco[.]" (Compl. ¶ 15.) The parties do not explain when or why the name change occurred, but Tyco does not dispute Plaintiffs' implicit characterization of ADT as Tyco's predecessor. Accordingly, the court refers to ADT as Tyco throughout this opinion.

processing equipment located at the NWCDS Operations Center[.]" [10] (Monitoring Center Agreement, Ex. C to Compl. [1-1] ("NWCDS/Tyco Agreement") at § 3.1.) Under the NWCDS/Tyco Agreement, the exclusivity "pertains only to [Tyco's] receiving and processing systems, which receive [signals.]" (*Id.*) It "does not provide any right to [Tyco] to require . . . End-Users to utilize [Tyco] services or equipment in individual premises to generate alarms that [Tyco's] receiving and processing systems receive and rout to NWCDS[.]" (*Id.*) Instead, the agreement provides, if Commercial Accounts chose to transmit signals directly to NWCDS, rather than using a central station, then they were "free to utilize the services and equipment of any vendor at individual premises for the generation of alarms which [Tyco] will rout to NWCDS[.]" (*Id.*) The NWCDS/Tyco Agreement has an initial ten-year term and automatically renews for one-year terms unless either party gives at least six months' notice. (*Id.* at § 2.) Under this agreement, Tyco's equipment at NWCDS can receive signals from multiple villages and cities, including Schaumburg. (Ex. A to NWCDS/Tyco Agreement.)

Thus, as the court understands it, when NWCDS and Tyco first signed their agreement in 2011, before the Ordinance was passed, Commercial Accounts in Schaumburg had two options[11]: they could send signals to NWCDS's remote supervising station, or they could send signals to central stations operated by providers like Plaintiffs.[12] If they sent signals to NWCDS's remote supervising station, they had to send their signals to Tyco's receiving equipment, though they could use any provider they chose to generate alarms within the building. If they chose the central station option, they could contract with any NFPA-72-

---

[10] This agreement apparently replaced a 2001 agreement between NWCDS and a predecessor to ADT Security Services and Tyco. (Compl. ¶ 65 n.5.)

[11] NFPA 72 also allows for a third option: proprietary supervising stations, in which property owners own and maintain their own supervising stations (*NFPA 72* § 3.3.282.2 (2016 ed.), Ex. D to Compl.); this type of supervising station is not at issue in this case.

[12] Plaintiffs contend that NFPA 72 "recognizes central stations as the preferred monitoring service[.]" (Compl.¶ 21.) But the section of NFPA 72 that they cite does not support this proposition, nor can the court find any such support in the provided NFPA 72 excerpt. (*See NFPA 72* § 3.3.282.3 (2016 ed.), Ex. D to Compl. [1-1] (cited by Compl. ¶ 21).)

compliant provider, and the central station operator would call NWCDS when there was an alarm signal. Plaintiffs add that, in lieu of calling NWCDS on the telephone, these central stations "also have the ability to automatically re-transmit alarm signals to [dispatchers] such as NWCDS." ((Compl. ¶ 56.) Central stations in Schaumburg did not exercise this functionality, however, because the NWCDS/Tyco Agreement prevents them from doing so: NWCDS can only receive signals transmitted "through Tyco's equipment." (Def. NWCDS's Mem. in Opp. to Pls.' Mot. for TRO ("NWCDS Resp.") [19] at 11.) In any case, once the Village passed the Ordinance, the second option was eliminated: property owners in Schaumburg had to send signals to NWCDS's remote supervising station, which by virtue of the NWCDS/Tyco Agreement, meant that they also had to send signals to Tyco's receiving equipment.

After passage of the Ordinance, then, Commercial Accounts in Schaumburg must transmit signals to Tyco equipment that receives signals at NWCDS. What is less clear is whether the NWCDS/Tyco Agreement requires that Schaumburg Commercial Accounts use Tyco equipment to *transmit* signals, as well. In a case involving a similar (though not identical) agreement (detailed below), language giving Tyco "the exclusive right to install, own, maintain and service all alarm signal receiving and processing equipment and systems[,]" *Alarm Detection Sys., Inc. v. Orland Fire Prot. Dist.*, 194 F. Supp. 3d 706, 718 (N.D. Ill. 2016), was found to require exclusivity only for receiving signals, not transmission of signals. *Id.* at 719. Defendants, for their part, contend that Plaintiffs' customers need only connect with Tyco's receiving equipment at NWCDS, suggesting that Commercial Accounts can use any equipment they like to transmit signals. (*See* Tyco Surreply in Opp. to Pls.' Mot. for TRO and Prelim. Inj. ("Tyco Surreply") [46] at 3.)

Yet several factors indicate that Tyco's exclusive right to receive signals at NWCDS also dictates that Tyco must install equipment directly at the Commercial Accounts to transmit those signals. First, sometime "shortly" after passing the Ordinance (Compl. ¶ 72), the Village sent notices to all Commercial Accounts in the Village explaining that the Ordinance "require[s] all

7

fire alarm systems in the village to be monitored [by NWCDS]." (Notice, Ex. H to Compl. [1-1].) The notice explained that Tyco is the "authorized installer of radio equipment required for fire alarm systems monitored by NWCDS." (*Id.*) The notice also references a waiver of "fees for the radio installation[,]" suggesting that the Ordinance required that radios be installed at the Commercial Accounts. (*Id.*) Second, Plaintiffs allege in their verified complaint that under the Ordinance, Commercial Accounts "must contract with Tyco to obtain and maintain the wireless transmitters that will be monitored at NWCDS[.]" (Compl. ¶ 16; *see* Compl. ¶ 69.) At least for purposes of the pending motion, whether Commercial Accounts must use Tyco equipment to transmit signals to NWCDS is disputed.

### B. Plaintiffs' Claimed Injuries

Plaintiffs contend that the combined effect of the Ordinance and the NWCDS/Tyco Agreement injures them in two ways: (1) it prevents them from competing for fire alarm monitoring business (*see id.* at ¶ 2), and (2) it requires their existing customers to terminate their contracts, or decline to renew them when they otherwise would have. (*Id.* at ¶ 5.) As for the first injury, Plaintiffs allege that Tyco will eventually become the sole provider of fire alarm monitoring services in Schaumburg, squeezing out Plaintiffs. (*Id.* at ¶¶ 26, 31, 96.) As a result, Plaintiffs contend, Tyco can charge higher prices; Plaintiffs assert that Tyco's monthly charge of $81 per month[13] for transmission devices exceeds Plaintiffs' fees for monitoring via a central station. (*Id.* at ¶¶ 26, 80, 82.) NWCDS and Schaumburg also benefit financially from the arrangement: Tyco pays NWCDS for each Commercial Account (NWCDS/Tyco Agreement § 7.1), and Schaumburg receives a reduction in the fees that it pays to NWCDS for dispatch services, allegedly resulting in Schaumburg's saving $300,000 per year. (Compl. ¶ 85.) Again, Plaintiffs do not explain this calculation; while the NWCDS/Tyco Agreement refers to an

---

[13] The NWCDS/Tyco Agreement states that Tyco will charge Commercial Accounts just $22 per month (in addition to a $150 connection fee). (NWCDS/Tyco Agreement § 6.1.) Plaintiffs do not explain how it is that Tyco is nevertheless able to charge $81 per month.

"administrative fee" that Tyco pays to NWCDS, the court can find nothing in the record showing whether or how any of this fee is passed on to Schaumburg.

Plaintiffs further claim that some of their customers are disadvantaged by the Ordinance. First, because many contracts provide for automatic renewal unless the customer gives some advance notice, the deadline in giving notice of nonrenewal may have already passed for at least some customers. Plaintiffs suspect that these customers will nevertheless decline to renew their contracts, in order to begin using Tyco's equipment, but breach their contracts with Plaintiffs by doing so without giving the requisite notice. (*See id.* at ¶ 23.) The court notes that such injuries have likely already occurred, however, given the amount of time since the Ordinance was passed. Other Commercial Accounts, presumably, also have existing contracts with Plaintiffs that may expire after August 31, 2019. The court will assume that Plaintiffs have standing to assert these particular injuries, but notes that Plaintiffs themselves are injured only if these customers actually terminate such contracts prematurely, not merely because customers are forced to pay Plaintiffs for services they cannot use.

Plaintiffs also contend the Ordinance causes irreparable injury. Even if it is ultimately struck down, they contend, it will result in lasting damage to their business: fire alarm monitoring is characterized by contracts with multiyear terms that renew automatically, resulting in long-lasting relationships. (Compl. ¶¶ 22, 24.) In other words, customers forced by the Ordinance to contract with Tyco are likely to continue the relationship even if they are no longer required to use Tyco's services. (*See id.* at ¶ 121.) Furthermore, Plaintiffs note that fire alarm services are often bundled, and that customers often use the same company that installs the signal transmission device to perform maintenance, testing, and other fire alarm services. (*Id.* at ¶ 99.)

In fact, Plaintiffs claim that they have already begun to lose customers as a result of the Ordinance. First, an unidentified customer of Plaintiff SMG Security Systems operates a 15-building apartment complex; that customer gave "verbal notice" that it would terminate its contract with SMG and instead contract with Tyco. SMG does not say whether the customer

stated a reason for the termination, or whether the termination takes effect immediately or upon the contract's expiration in April 2018. (*Id.* at ¶ 76.) Two customers of Plaintiff Alarm Detection Systems ("ADS") notified ADS that they would not renew their contracts because of the Ordinance. (*Id.* at ¶¶ 77–78; Ex. I to Compl. [1-1]; Ex. J to Compl. [1-1].) Without further specifics, Plaintiffs also claim that "several" customers have been "forced to terminate" contracts. (Compl. ¶ 79.) Plaintiffs allege that without the Ordinance, "most if not all" customers would renew their contracts with Plaintiffs. (*Id.* at ¶ 117.)

Defendants, however, dispute that any customers are required to terminate contracts, or to decline to renew them—they point out that Plaintiffs themselves are free to lease Tyco's equipment from Tyco, and in turn provide it to their customers, allowing existing contracts to remain in place. (Tyco Surreply at 3.) After the Ordinance was passed, another fire alarm provider who operates within Schaumburg, Fox Valley Fire Safety (not one of the Plaintiffs), has contracted with Tyco in this manner. (Ex. A to Tyco Surreply [46-1].)

Plaintiffs filed their verified complaint on March 20, 2017, asking that enforcement of the Ordinance be enjoined, and, in the alternative, for an award of damages; they simultaneously filed a motion for a temporary restraining order and preliminary injunction. (Compl.; Pls.' Mot. for TRO and Prelim. Inj. [8].) Plaintiffs allege violations of the antitrust laws: Sherman Act § 1 (contract or conspiracy in restraint of trade), Sherman Act § 2 (monopolization and attempted monopolization), and Clayton Act § 7 (acquisition lessening competition or tending to create a monopoly). Plaintiffs also allege several constitutional violations: violations of the Contracts Clause, and of Plaintiffs' due process and equal protection rights under the Fourteenth Amendment. Finally, Plaintiffs complain of tortious interference with contract and prospective business advantage. Plaintiffs have also pleaded a claim of unjust enrichment, for which they are not seeking an injunction. The court heard oral argument on April 12, 2017. For the reasons stated below, the motion for a preliminary injunction is denied.

## II.    Related Litigation

Ordinances and contracts that govern alarm transmission have generated at least three other court proceedings.  The three cases involve many of the same parties and some of the same issues involved in this litigation, and the parties to this case have addressed them in detail in their briefs.  These cases contain important similarities and differences to this litigation, as explained below.

### A.    *Lisle-Woodridge* Case

In *ADT Security Services, Inc. v. Lisle-Woodridge Fire Protection Distict*, 672 F.3d 492, 496–97 (7th Cir. 2012) [hereinafter *Lisle-Woodridge I*], the Lisle-Woodridge Fire Protection District adopted an ordinance that required all Commercial Accounts to wirelessly connect to the district's remote supervising station, eliminating the central station option.  The ordinance provided that the radio transceiver allowing this connection could be installed only by the district's selected contractor.  *Id.* at 497.  The plaintiffs, as here, were several fire alarm monitoring companies who operated central stations, and brought antitrust, constitutional, and tortious interference claims.  *ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prevention Dist.*, 799 F. Supp. 2d 880, 881 (N.D. Ill. 2011) (Shadur, J.), *aff'd in part, rev'd in part sub nom. ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.*, 672 F.3d 492 (7th Cir. 2012).  The district court permanently enjoined the ordinance, but did not reach the federal law claims; the court ruled that the Fire Protection District did not have the legal authority under Illinois law to enact the ordinance, because Fire Protection Districts are granted only limited powers.  *Id.* at 884–85; *Lisle-Woodridge I*, 672 F.3d at 495.  The Court of Appeals reversed the district court's order that the district lacked the authority to select its preferred method of fire alarm monitoring; to the contrary, the Seventh Circuit held that the district could require wireless connection to its remote supervising station.  *Lisle-Woodridge I*, 672 F.3d at 501–02.  But the Court of Appeals upheld the district court's injunction against the portion of the ordinance that allowed the district to

select an exclusive provider of the equipment to connect to the remote supervising station. *Id.* at 502–03.

Because the government entity defendant in *Lisle-Woodridge* was a fire protection district, it did not have the freedom to adopt any fire code; instead, the district is authorized by state law to adopt a fire code "parallel to national standards," which the Seventh Circuit held to mean a code consistent with NFPA 72. *Lisle-Woodridge I*, 672 F.3d at 501. The Seventh Circuit remanded the case so the district court could examine whether the Ordinance was "parallel" to NFPA 72 and modify its injunction. Following the Seventh Circuit's ruling, the district court examined the public safety impact of the ordinance to determine if it was "parallel to"—that is, offering the same level of protection as—NFPA 72.

The district court concluded that the public safety justifications for the ordinance were not credible, the District's system was less reliable than central stations, and that the ordinance was not parallel to NFPA 72; the court also found that while the remote supervising station response times were faster than the central station monitoring response times, this disparity could be eliminated if the dispatcher "pre-populated" information about buildings in the District into its computer system. Modified Permanent Inj. Order (Amended 7/18) at 17–28, *ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.*, No. 10 C 4382 (N.D. Ill. Aug. 7, 2012), ECF No. 391; *see generally ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.*, No. 10 C 4382, 2012 WL 3241562, at *1 (N.D. Ill. Aug. 7, 2012), aff'd, 724 F.3d 854 (7th Cir. 2013). The district court therefore enjoined the portion of the ordinance that eliminated the central station option. Modified Permanent Inj. Order (Amended 7/18) at 29, *ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.*, No. 10 C 4382 (N.D. Ill. Aug. 7, 2012), ECF No. 391. The Court of Appeals again affirmed in part and reversed in part; but the only issue relevant to this case concerned the district court's factual findings regarding the alleged safety motivation of the ordinance, which the court affirmed. *ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.*, 724 F.3d 854, 866–71 (7th Cir. 2013) [hereinafter *Lisle-Woodridge II*].

*Lisle-Woodridge* is somewhat similar to this case, but there are a number of key differences. Prominently, that case involved a fire protection district, and the basis for the decision was the Illinois Fire Protection District Act, 70 ILCS 705/1 *et seq.*, which allows local governments to consolidate fire protection services by creating a fire protection district with limited powers, such as the power to employ firefighters and tax residents to pay for fire protection services. 70 ILCS 705/6, 705/14. The court determined that Illinois had not granted fire protection districts the power to select an exclusive provider. *See Lisle-Woodridge I*, 672 F.3d at 495, 498. Municipalities like Schaumburg have much broader powers, *see* 65 ILCS 5/1-1-1 *et seq.*, so that case has limited value here. Equally importantly, the Seventh Circuit's conclusion that the District did not have the power to select an exclusive provider was not based on federal antitrust law.[14] In addition, after adopting the Ordinance, the District sent letters to property owners announcing that the ordinance "supercede[d]" their existing fire alarm monitoring contracts, and that those existing contracts were "null and void"—the Village has made no such bold pronouncement here. *Id.* at 497. Further, the *Lisle-Woodridge* court had an extensive factual record (as it concerned a permanent injunction) concerning the safety of the proposed options—as explained above, some factual questions in this case remain uncertain.

Finally, the court notes that Tyco's predecessor, ADT, was a plaintiff in the *Lisle-Woodridge* litigation, and after the Seventh Circuit issued *Lisle-Woodridge II*, Tyco sent letters to several fire protection districts who had "entered the fire alarm monitoring business" warning them that by doing so, the districts had "displaced the private market for fire alarm monitoring for commercial subscribers within the political boundaries of the fire protection district[.]" Tyco's

---

[14] The court did express general concerns that the ordinance would have anticompetitive effects, but those comments are dicta. *See Lisle-Woodridge II*, 724 F.3d at 865 ("Excluding alarm companies from the monitoring business or making it unduly burdensome for them to participate raises significant concerns about the anti-competitive effects of this requirement[.]"); *Lisle-Woodridge I*, 672 F.3d at 499 ("[T]hose powers [of a Fire Protection District] are not so broad as to enable the District to establish a monopoly over alarm transmitters and monitoring services[.]"); 503–04 ("acknowledg[ing] [the] possibility" that the ordinance may create a monopoly).

letter asserted that this displacement "is not compliant with the antitrust laws of the United States." (Ex. HH to Transcript.[15]) Though that statement was not made in the course of litigation, that position appears contrary to the position that Tyco has taken in this case.

**B.    *Orland* Case**

The parties also note the case of *Alarm Detection Systems, Inc. v. Orland Fire Protection District*, No. 14 CV 876, currently pending before another judge in this court.[16] The plaintiff in that case is one of the same plaintiffs here, ADS, and Tyco is a defendant. *Orland* concerns three fire protection districts: Lemont, Bloomingdale, and Orland, which passed different ordinances about fire alarm monitoring.

The *Orland* complaint alleged that Orland directly authorized Tyco to "sell or lease the transmission equipment subscribers must use to connect to Orland's communications center." *Alarm Detection Sys., Inc. v. Orland Fire Prot. Dist.*, 129 F. Supp. 3d 614, 638 (N.D. Ill. 2015) [hereinafter *Orland I*] (granting in part and denying in part defendants' motion to dismiss). The plaintiff alleged that (1) "[o]nly Tyco [can] provide the transmission of alarm signals from [commercial and multi-unit residential buildings] to the Orland Communications Center," and that (2) Tyco must provide equipment to operate the alarm receiving system and provide monitoring services to building owners. *Id.* at 620 (alteration in original). In effect, the plaintiff alleged "that Orland has authorized Tyco to require Orland subscribers 'to buy' or lease the 'wireless transmitter' necessary to connect to Orland's Communication Center from Tyco, and to pay Tyco for its installation." *Id.*

Lemont and Bloomingdale passed ordinances requiring that signals be sent to the districts' individual communications centers, which would retransmit those signals to the

---

[15]    This exhibit was provided to the court at oral argument but has not been electronically filed.

[16]    As of this writing, the court has held a bench trial, but not yet ruled. The citations in this opinion are from the *Orland* court's rulings on defendants' motions to dismiss and the parties' cross motions for summary judgment.

dispatcher, known as Du-Comm. *Id.* at 619; *see Alarm Detection Sys., Inc. v. Orland Fire Prot. Dist.*, 194 F. Supp. 3d 706, 710 (N.D. Ill. 2016) [hereinafter *Orland II*] (granting in part and denying in part cross-motions for summary judgment). In response to the *Lisle-Woodridge* rulings, Lemont sold its equipment and assigned its service contracts to Tyco "on an interim basis"; Orland then took over monitoring of the Lemont accounts. *Orland I*, 129 F. Supp. 3d at 622–23. Lemont notified its Commercial Accounts that they were free to contract with any licensed fire alarm vendor to monitor their alarm. *Id.* at 623. Bloomingdale also assigned its equipment and contracts to Tyco, but apparently Orland did not take over Bloomingdale's monitoring. *Id.* Instead, Tyco maintained Bloomingdale's monitoring station, which continued to transmit signals to Du-Comm. *Orland II*, 194 F. Supp. 3d at 718; *Orland I*, 129 F. Supp. 3d at 623. Like Lemont, Bloomingdale informed Commercial Accounts that they could select any qualified fire alarm monitoring contractor that they desired. *Orland I*, 129 F. Supp. 3d at 623.

But after Bloomingdale's assignment of contracts and equipment to Tyco, Du-Comm *also* entered into an agreement with Tyco. *Orland II*, 194 F. Supp. 3d at 718. The Du-Comm/Tyco Agreement contained similar language to the NWCDS/Tyco Agreement. The exclusivity language is virtually identical: "Du-Comm grants to Tyco the exclusive right to install, own, maintain and service all alarm signal receiving and processing equipment and systems located at the Du-Comm Operations Center and the Tyco-Covered Agencies." *Id.* Unlike the NWCDS/Tyco Agreement, however, the Du-Comm/Tyco Agreement also provided:

> "[T]he Du-Comm [O]perations Center may receive, process, handle, respond to, and dispatch alarm signals received from Member Departments that are not a Tyco-Covered Agency (a 'Non-Participating Member Department'). . . . In such event, such Non-Participating Member Department alarm signals shall not be routed through the Tyco Equipment." . . . "Non-Participating Member Departments" are also exempt from the requirement to contract with Tyco.

*Id.* The *Orland* court did not define a "Tyco-Covered Agency" or "Member Department." Similarly, the NWCDS/Tyco Agreement does not define "ADT Covered Agencies," but does include an exhibit labeled "ADT Covered Agencies," which lists those villages and cities for

which NWCDS provides emergency communications services. (NWCDS/Tyco Agreement at 1; Ex. A to NWCDS/Tyco Agreement.) As far as the court can tell, the Du-Comm/Tyco Agreement only required subscribers to connect with Tyco when their respective fire protection district desired to rout their signals to Du-Comm, as Bloomingdale did.

The plaintiff alleged a number of causes of action; the antitrust claims and Fourteenth Amendment claims are relevant here.[17] The court denied ADS's requested temporary restraining order, on the ground that because damages could compensate ADS, there was no irreparable harm. (Transcript of Proceedings, Apr. 14, 2014, at 44:24–45:11, *Alarm Detection Sys. v. Orland Fire Prot. Dist.*, No. 14 CV 876, Ex. E to Tyco Surreply [46-1].) Defendants then moved to dismiss.

The court effectively categorized the antitrust claims into two types: the Bloomingdale agreements, and the Orland and Lemont agreements. The court dismissed the claims based on the Bloomingdale agreements, concluding that "the contracts between Tyco and Du-Comm, and Du-Comm and Bloomingdale FPD do not [show that] customers are required to contract with Tyco to send signals to Du-Comm." *Orland II*, 194 F. Supp. 3d at 719. In particular, the court pointed out that the Du-Comm/Tyco agreement contemplated that "Non-Participating Member Departments" were not required to contract with Tyco or to rout signals through Tyco equipment.[18] *Id.* at 718. The court distinguished *Lisle-Woodridge* on the grounds that *Lisle-Woodridge* concerned "the business of transmitting fire alarm signals, as opposed to merely receiving them at a 911 dispatch center[.]" *Id.* at 719. But the court added that there might be a barrier to entry that could state a claim under the antitrust laws "[i]f it were the case that

---

[17] After the court granted in part the defendants' first motion to dismiss, the plaintiff filed an amended complaint, which the defendants again moved to dismiss. The court referred extensively to its ruling on the superseded pleading, and noted that for some issues "neither Tyco nor Orland . . . have made any new arguments requiring the Court to reconsider its decision." *Orland II*, 194 F. Supp. 3d at 710–11. This court cites to that earlier ruling as well.

[18] Though the non-exclusivity was the basis for the court's decision, as noted above, the court is uncertain whether individual subscribers within *participating* "Member Departments" were required to contract with Tyco.

Bloomingdale . . . customers could only send their fire alarm signals to Du-Comm's dispatch center if they used Tyco as their fire alarm signal service company[.]" *Id.* at 720. As explained above, the court is not certain if that describes the case here; the parties apparently dispute whether the Ordinance requires Commercial Accounts to use Tyco's transmission equipment.

On the other hand, the court did not dismiss the claims that related to the agreements in Orland (and Lemont, after Orland took over Lemont's monitoring). *Id.* at 721. The court found that unlike the Bloomingdale ordinance, the Orland ordinance did require that customers use Tyco equipment to *transmit* their signals, not merely that the FPD use Tyco to receive the signals at its remote supervising station. *See Orland I*, 129 F. Supp. 3d at 638–39.

As for the due process claims, the court found that the Du-Comm/Tyco agreement did not deprive ADS of its rights under its license, nor discriminate against ADS, because the agreement "contemplates that 'Non-Participating Member Departments' can connect to Du-Comm without contracting with Tyco." *Orland II*, 194 F. Supp. 3d at 724. But because the Orland ordinance required that ADS and other alarm companies contract with Tyco to transmit fire alarm signals, and because it did so in violation of the Fire Protection District Act, ADS plausibly alleged that the value of those licenses was diminished and that the district's conduct was arbitrary, stating due process and equal protection claims. *Id.* at 725–26.

### C.    *Hinsdale* Case

The parties also discuss one other related case. In *Alarm Detection Systems, Inc. v. Village of Hinsdale*, 326 Ill. App. 3d 372, 374, 761 N.E.2d 782, 785 (2d Dist. 2001) [hereinafter *Hinsdale*], the Village of Hinsdale passed "an ordinance that required all owners of commercial buildings to connect their fire alarm systems directly to the Village's fire board for monitoring." ADS, again the plaintiff, sought to enjoin the ordinance, but the Illinois Appellate Court upheld it. The court observed that a municipality has the authority under Illinois law "to amend national building or fire codes or draft its own codes as it determines is necessary in order to protect the

public safety and welfare."[19]  *Id.* at 380, 761 N.E.2d at 789.  In particular, the court found that this power was granted to municipalities under two sections of Article 11 of the Illinois Municipal Code, which deals with public health, safety, and welfare.  *Id.*; *see* 65 ILCS 5/11-8-2, 5/11-30-4. The court held that the defendant village had a "reasonable basis to conclude" that remote supervising stations would result in faster emergency response times than central stations. *Hinsdale*, 326 Ill. App. 3d at 380, 761 N.E.2d at 790.

With this background in mind, the court turns to Plaintiffs' claims.

## DISCUSSION

Plaintiffs are seeking to enjoin enforcement of the Ordinance, and ask the court to order that NWCDS and Tyco "completely divest themselves of the [fire alarm monitoring business] they operate together[.]"  (Compl. ¶ 122.)  A plaintiff seeking a preliminary injunction must show (1) that it is likely to succeed on the merits of the litigation, (2) that there is no adequate legal remedy, and (3) that it will suffer irreparable harm if the preliminary injunction is not granted. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008).  If these criteria are met, the court must balance the irreparable harm to the plaintiff in the absence of the injunction, with the harm to the defendant if the injunction is granted.  *Id.* "In so doing, the court employs a sliding scale approach: '[t]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor.'"  *Id.* (quoting *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 387 (7th Cir. 1984)).  Within this balancing, the court must also consider the public interest.  *Id.*

---

[19]      *Lisle-Woodridge* and *Orland* concerned whether fire protection districts have the same power.

## I.     Antitrust Claims

### A.     Sherman Act Claims Against the Village

The Village argues that it cannot be held liable for the antitrust claims because it is entitled to state-action immunity from the antitrust laws.[20]   Under this doctrine, states may "impos[e] market restraints 'as an act of government.'"   *F.T.C. v. Phoebe Putney Health Sys., Inc.*, 568 U.S. 216, 224 (2013) (quoting *Parker v. Brown*, 317 U.S. 341, 350 (1943)).   In other words, the state may formulate a regulatory scheme that displaces competition, and may delegate the power to implement that scheme to local government entities.   *Id.* at 225.   But this immunity will apply to local governments only if there a "clearly articulated and affirmatively expressed" state policy to displace competition.   *Id.* at 226 (quoting *Cmty. Commc'ns Co. v. City of Boulder*, 455 U.S. 40, 52 (1982)).   In other words, if the state delegates some regulatory function to local governments (for example, the power to regulate local utilities), the local government may act in ways that suppress competition only if the state "clearly articulates" that it expects a monopoly or some other anticompetitive effect.   The state must intend not only that the municipality carry out the regulatory scheme, but that it will displace competition in doing so.

For a state policy to be "clearly articulated," a state legislature need not "expressly state" its intent that "the delegated [regulatory function] . . . have anticompetitive effects."   *Id.* (quoting *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 43 (1985)).   A state policy to generate anticompetitive effects is clearly articulated "if the anticompetitive effect was the 'foreseeable result' of what the State authorized."   *Id.* at 227 (quoting *Hallie*, 471 at 42).   In *Phoebe Putney*, the state gave local hospital authorities a variety of powers, but "state-law authority to act is insufficient to establish state-action immunity; the sub[-]state governmental entity must also

---

[20]      In *Orland*, the court found that the state-action immunity doctrine to the federal antitrust laws did not apply because "Alarm Detection has made no claims under Illinois's antitrust laws."   *Orland I*, 129 F. Supp. 3d at 639.   State-action immunity can also apply under federal antitrust laws, however.

show that it has been delegated authority to act or regulate *anticompetitively*." *Phoebe Putney*, 568 U.S. at 228 (emphasis added).

The Village points to two Illinois statutes, both of which purport to articulate state policy on anticompetitive activities delegated to municipalities. 50 ILCS 35/1 states:

> The General Assembly intends that the "State action exemption" to application of the federal antitrust laws be fully available to local governments to the extent their activities are either (1) expressly or by necessary implication authorized by Illinois law or (2) within traditional areas of local governmental activity.

Section 50 ILCS 35/1 essentially articulates that the state contemplates that local governments may act anticompetitively whenever they exercise *any* power. That language by itself may not be a sufficiently clearly articulated policy to displace competition.

But the Village finds more support in 65 ILCS 5/1-1-10, which provides:

> It is the intention of the General Assembly that the "State action exemption" to the application of federal antitrust statutes be fully available to all municipalities, and the agents, officers and employees of each to the extent they are exercising authority as aforesaid, including, but not limited to . . . .
> . . . .
> (b) . . . all of Divisions of Articles 10 and 11 of the Illinois Municipal Code[.]

The fact that the state has such an "intention" demonstrates that it contemplated that municipalities would act anticompetitively in the areas governed by the named Articles. As noted above, the *Hinsdale* opinion recognizes that municipalities regulate fire alarm protection pursuant to Article 11 of the municipal code, which supports application of the immunity here.

That said, whether Article 11 itself, entitled "Corporate Powers and Functions," clearly articulates a policy to displace competition is open to question. The provisions of the Article are quite broad, and essentially cover all general police powers over public welfare and public property. See 65 ILCS 5/11-1-1 *et seq.* Moreover, the use of "including, but not limited to" indicates that the potential areas of anticompetitiveness may be broader, further calling into question whether this language can be understood to "clearly articulate" any policy. Courts that have addressed this statute have relied on it merely to confirm their independent conclusions that anticompetitive conduct was the "foreseeable result" of conduct authorized by the state.

*See Campbell v. City of Chicago*, 823 F.2d 1182, 1185 (7th Cir. 1987); *Charles Fiore Nurseries, Inc. v. Vill. of Long Grove*, No. 86 C 2339, 1986 WL 10372, at *4–5 (N.D. Ill. Sept. 16, 1986); *Wellwoods Dev. Co. v. City of Aurora*, 631 F. Supp. 221, 224–27 (N.D. Ill. 1986), *supplemented*, No. 85 C 8182, 1986 WL 4156 (N.D. Ill. Apr. 2, 1986), *and aff'd*, 822 F.2d 1091 (7th Cir. 1987); *Richard Hoffman Corp. v. Integrated Bldg. Sys., Inc.*, 581 F. Supp. 367, 372 (N.D. Ill. 1984); *cf.* Peter F. Nascenzi, Note, *FTC v. Phoebe Putney and Municipalities as Nongovernments*, 110 Nw. U. L. Rev. 963, 992–93 (2016) (calling the status of 65 ILCS 5/1-1-10 "unclear" in light of Supreme Court case law).

One statute therefore supports the conclusion that the state expected local governments to act anticompetitively with respect to broadly delegated powers, while the narrower statute suggests the state contemplated anticompetitive effects in a narrower, but still fairly broad arena. The court must determine whether either of these statutes likely supports delegation of immunity. Although state laws do not express an expectation that local governments will act anticompetitively specifically with respect to fire alarm monitoring, in 65 ILCS 5/1-1-10, the state did affirmatively convey its policy that the antitrust immunity would apply, demonstrating that it contemplated that municipalities would act in anticompetitive ways in the areas governed by Article 11.[21] In fact, this language supports the conclusion that the state "foresaw" this result. Because the state legislature made this contemplation explicit, the court finds it likely that the state "delegated authority to act or regulate anticompetitively," *Phoebe Putney*, 568 U.S. at 228,

---

[21] Defendants also cite to *Justice v. Town of Cicero*, 577 F.3d 768, 775 (7th Cir. 2009) in support of their argument. There, the court found the defendant town had state-action immunity for its control over the town's water department under 50 ILCS 35/1, not 65 ILCS 5/1-1-10. But section 5/1-1-10 contemplates anticompetitiveness over a more limited set of local government powers than section 35/1, so section 5/1-1-10 presents a stronger case for immunity than section 35/1.

in the areas where it contemplated that municipalities would get antitrust immunity in the powers granted by Article 11, which is at issue here.[22]

Plaintiffs challenge this reading of 65 ILCS 5/1-1-10. They argue that the statute contemplates a broad, generalized grant of powers to municipalities, and therefore cannot be interpreted as permitting the state to delegate the antitrust immunity. (Pls.' Reply Mem. in Supp. of Emergency Mot. for TRO and Prelim. Inj. ("Pls.' Reply") [42] at 6–7.) Plaintiffs cite to *Community Communications Co. v. City of Boulder*, 455 U.S. 40, 55 (1982), where the court held that the state's generalized grant of powers to a local government did not "contemplate" that the local government would act anticompetitively. But here Illinois has done more than grant generalized powers to municipalities. It has expressly conferred antitrust immunity, a protection that would not be necessary unless it is possible that municipalities will act anticompetitively when exercising these powers. The state's express contemplation of anticompetitive effects in enumerated general areas is a more explicit articulation than a simple generalized grant of powers would be.

Second, Plaintiffs urge that if Illinois had intended that certain municipal powers could permissibly have anticompetitive effects, it would have explicitly made those powers "exclusive," as it did by granting municipalities the authority to create or authorize exclusive providers of refuse disposal services, electricity, and natural gas. 65 ILCS 5/11-19-5, 5/11-117-1.1, 5/11-117-6(c). Those grants do present a more straightforward case for immunity, but the case law does not prescribe specific language by which states must "clearly articulate" their policy. Indeed, in delegating immunity, a state need not expressly proclaim that it expects the

---

[22] Because this is a preliminary injunction, the court need not decide whether the Village is in fact entitled to state-action immunity. Instead, the court need only determine that the Village is likely entitled to the immunity.

local government to act exclusively or anticompetitively.  *See Phoebe Putney*, 568 U.S. at 226 (quoting *Hallie*, 471 U.S. at 43).[23]

Finally, Plaintiffs argue that state-action immunity is preempted by federal law.  The Clayton Act, 15 U.S.C. § 35, gives local governments immunity from damages in antitrust actions; from this, Plaintiffs conclude that Congress intended to permit lawsuits against local governments that seek injunctions.  But the state-action immunity doctrine has not been interpreted as carving out claims for equitable relief.  *See Lawline v. Am. Bar Ass'n*, 956 F.2d 1378, 1382–84 (7th Cir. 1992) (finding defendants enjoyed state-action antitrust immunity in suit seeking an injunction and damages, as Plaintiffs do here).  The Village is likely to succeed in its argument that it has state-action antitrust immunity.

## B.    Sherman Act Claims Against NWCDS and Tyco

The Sherman Act claims against NWCDS and Tyco are also unlikely to succeed.  Crucial allegations are missing from each of the Sherman Act claims against these two defendants.  To state a claim under Section 1, there must be an agreement to restrain trade.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007) (quoting *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S., 537, 540 (1954)).  A claim for monopolization under Section 2 in turn requires not only monopoly power, but also "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."  *Elliott v. United Ctr.*, 126 F.3d 1003, 1004 (7th Cir. 1997) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966)).  Finally, a claim for attempted monopolization under Section 2 requires a showing of the defendant's specific intent to monopolize.  *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).

---

[23]    Plaintiffs also cite to *North Carolina State Board of Dental Examiners v. F.T.C.*, 135 S. Ct. 1101, 1110 (2015), but in that case, both parties assumed, as did the court, that the state had clearly articulated and affirmatively expressed a policy with anticompetitive effects. That case is therefore not instructive.

Each of these elements is missing from Plaintiffs' allegations against NWCDS and Tyco. NWCDS and Tyco agreed with each other that Tyco would operate the equipment for NWCDS, but Plaintiffs recognize that the NWCDS/Tyco Agreement itself was not illegal, and that they would not be injured without the Ordinance. (*See* Pls.' Reply 12–13.) Before the Ordinance, the remote supervising station at NWCDS acted in tandem with Plaintiffs' central stations. Only after the Village passed the Ordinance in 2016 did Tyco allegedly become the *exclusive* provider of fire alarm monitoring equipment in the Village.

And there is no indication that NWCDS or Tyco had any influence on the passage of the Ordinance, nor any suggestion that the timing is suspicious: NWCDS and Tyco had operated under their own agreement for five years before the Ordinance was passed.[24] There is no evidence of any other agreement with the Village, nor that either Defendant made any improper attempt to gain monopoly power or acted with the intent to monopolize. The court presumes that Tyco and NWCDS benefit financially from the Ordinance, but that alone does not establish that Plaintiffs will be likely to prove anticompetitive conduct on the part of these Defendants.[25]

### C. Clayton Act Claims

Plaintiffs' final antitrust cause of action arises under section 7 of the Clayton Act. That section prohibits the acquisition of assets where the effect "may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. Plaintiffs correctly note that an actionable acquisition need not be the traditional acquisition of stock or assets, and that "[t]he

---

[24]     Even if NWCDS or Tyco had urged the passing of the Ordinance, the court remains uncertain that could be a basis for liability. *See E. R. R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 135 (1961) ("[N]o violation of the [Sherman] Act can be predicated upon mere attempts to influence the passage or enforcement of laws.").

[25]     NWCDS also argues that it is entitled to state-action immunity, but the court is less certain. 65 ILCS 5/1-1-10 applies only to municipalities, and although 50 ILCS 35/1 applies to all "local governments," the court noted above that section 35/1 expresses a policy of delegating antitrust immunity in a much broader set of circumstances, essentially whenever a traditional local government activity is authorized by law. With such a broad expectation of anticompetitiveness, it is more difficult to say that any anticompetitiveness in fire protection stems from a "clearly articulated" policy, rather than a policy that is so general it is not clearly articulated. But the court need not reach the issue at this stage.

economic significance of the relationship, rather than its size or form, is the relevant inquiry." *Mr. Frank, Inc. v. Waste Mgmt., Inc.*, 591 F. Supp. 859, 866 (N.D. Ill. 1984); *see also United States v. Philadelphia Nat. Bank*, 374 U.S. 321, 342 (1963) ("Congress contemplated [that Section 7 would have] a reach [over] the entire range of corporate amalgamations[.]"). Plaintiffs here do not explain how the relationship between any Defendants resembles an acquisition. The cases Plaintiffs cite—*In re Mushroom Direct Purchaser Antitrust Litigation*, No. 06-0620, 2016 WL 8459462, at *10–12 (E.D. Pa. Dec. 13, 2016), and *Mr. Frank*, 591 F. Supp. at 862, 866—both involved acquisition of distinct assets (mushroom farms and waste disposal facilities). Plaintiffs have identified no such assets. Instead, they simply reiterate that the alleged scheme "smacks of price fixing and unfair competition." (Pls.' Mem. in Supp. of Mot. for TRO and Prelim. Inj. ("Pls.' Mem.") [9] at 11.) If price fixing, unfair competition, and market concentration were "acquisitions," every antitrust cause of action would implicate this statute. Plaintiffs are not likely to succeed on the merits of their Clayton Act claim.[26]

---

[26] The court therefore declines to address the merits of the antitrust claims, or to conduct the fact-intensive analysis required to examine the likelihood of success on the merits of these antitrust claims. The result of such an analysis is not clear-cut. For example, the parties dispute the definition of the relevant geographic market, a critical question in an analysis of monopolization claims. *See* U.S. Dep't of Justice & Federal Trade Comm'n, *Horizontal Merger Guidelines* (2010), https://www.justice.gov/sites/default/files/atr/legacy/2010/08/19/hmg-2010.pdf, at § 4.2. Plaintiffs point out that Commercial Accounts in Schaumburg have no alternative to using Tyco's equipment. Thus, they conclude, Schaumburg is the relevant market. Defendants concede that "the area in which consumers can practically turn for alternative sources of the product" is important to this determination. (Tyco Surreply 5 (quoting *F.T.C. v. OSF Healthcare Sys.*, 852 F. Supp. 2d 1069, 1076 (N.D. Ill. 2012)).) But they also cite their expert report in the *Orland* case, in which their expert claims that in the Orland district, the prices Tyco charges are no higher than in territories where it does not have exclusivity, suggesting that the entire Chicago area is the relevant market. (Rep. of John Durkin, Ph.D. at 7, 24–25, 31, *Alarm Detection Sys. v. Orland Fire Protection Dist.*, No. 14 CV 876, Ex. B to Tyco Surreply [46-1].) This position appears to conflict with their position in *Lisle-Woodridge*, where ADT (Tyco's predecessor) asserted in the verified complaint, which it made along with several Plaintiffs in this case, that the relevant geographic market in that case was limited to the Lisle-Woodridge fire protection district, not the greater Chicago area. (Supp. Verified Compl. at ¶¶ 7, 91–92, *ADT Sec. Servs. v. Lisle-Woodridge Fire Protection Dist.*, No. 10 CV 4382 (N.D. Ill. Jul. 14, 2010), Ex. GG to Transcript; *see also* Ex. HH to Transcript.)

## II.    Other Claims Against the Village

### A.    Contracts Clause

To evaluate whether a law violates the Contracts Clause, the court first asks whether it substantially impairs a contractual relationship.  *Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 411 (1983).  If it does, then the law is acceptable only if it has a significant and legitimate public purpose, and the impairment is "reasonable" and "of a character appropriate to the public purpose."  *Id.* at 411–12 (quoting *U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 22 (1977)).

The parties dispute whether the Ordinance substantially impairs existing contracts.  Plaintiffs point out that their contracts often renew automatically and require customers to give notice if they choose not to renew.  (Pls.' Mem. at 4.)  When the Ordinance was passed in August 2016, some contracts had not yet expired, but the time to give notice of nonrenewal had already passed—these customers were, thus, forced to terminate their contracts with Plaintiffs on their original term expiration date, but in violation of contract provisions that required the customers to give notice to Plaintiffs of nonrenewal.  There is room to question whether unexpected nonrenewal of a contract just before its expiration constitutes "substantial" impairment.  More compelling is the fact that any contract whose expiration date is after August 31, 2019 must still connect with Tyco and NWCDS by that date—thus, if some contracts have not yet expired, customers will have to prematurely terminate these contracts.  Moreover, the Ordinance also requires customers to connect to NWCDS whenever their existing fire alarm equipment is modified or replaced.  Thus, if any customers modify their equipment during the pendency of an existing contract, they will be forced to terminate that contract and connect with Tyco.

Defendants argue that the Ordinance does not substantially impair existing contracts for several reasons.  First, the Village notes that parties to contracts that expire after August 31, 2019 may seek an exemption from the Ordinance, which permits an extension of the time to

connect to NWCDS.  But an extension is not guaranteed; an extension is permitted only if the fire chief determines if the public safety is not affected.

Defendants also contend that the Ordinance does not actually require contracts to be terminated; Defendants characterize the Ordinance as merely "ask[ing]" customers to "directly connect with NWCDS . . . by August 31, 2019." (*See* NWCDS Resp. 7.)  As the court reads the Ordinance, however, its direction that fire alarm systems "shall" transmit signals to the designated remote supervisory station belies that characterization.

Next, Defendants urge that the customers who have already decided to terminate or not to renew their contracts did so of their own volition, unprompted by the Ordinance.  (NWCDS Resp. at 7.)  This is belied by the fact that some customers have stated explicitly that they chose not to renew because of the Ordinance.  But Defendants are likely correct that a law that impedes a customer from renewing a contract does not impair any *existing* contract—it would seem to affect only prospective contracts.  Plaintiffs also claim that at least one customer, whose contract with one of the Plaintiffs was due to end in 2018, has "terminate[d]" its contract and will contract with Tyco instead.  (Compl. ¶ 76.)  As discussed earlier, however, it is not clear that this allegation refers to a customer who terminated a contract before its expiration, or one who simply declined to renew the contract.

As Defendants also point out, Plaintiffs have not actually identified specific contracts that expire after August 31, 2019.  (Vill. of Schaumburg Resp. to Pls. Mot. for TRO and Prelim. Inj. ("Village Resp.") [21] at 8–9.)  Moreover, Defendants assert "Plaintiffs can maintain their business relationships with their customers by contracting with Tyco to connect to its receiving equipment in NWCDS."  (Tyco Surreply 3.)  Indeed, another fire alarm company, Fox Valley, has made such an agreement with Tyco.  (Ex. A to Tyco Surreply.)  Because the parties have not presented evidence on this issue, the court is uncertain of the extent to which contracts are being impaired: the court does not know whether it is feasible for Plaintiffs to contract with Tyco, or how much it would cost.  In any event, even with this option, Plaintiffs would presumably have

to pay Tyco in order to continue providing services to customers that they could previously provide on their own. While it is true that, unlike the Lisle-Woodridge ordinance, the Village Ordinance does not explicitly render existing contracts "null and void," *Lisle-Woodridge I*, 672 F.3d at 497, "[t]otal destruction of contractual expectations is not necessary for a finding of substantial impairment." *Energy Reserves Grp.*, 459 U.S. at 411.

In short, there are a number of questions about how significantly the Ordinance interferes with existing contracts. The court need not resolve these questions at this stage, however, because even if the Ordinance does substantially impair contracts, Plaintiffs are unlikely to succeed in proving that the Ordinance lacks a sufficiently tailored significant and legitimate purpose. Here, the Ordinance's stated purpose is that it will improve public safety, based on the Village's experience with "alarms being out of service[.]" (Ordinance 16-078.) In assessing the legitimacy of the purpose, the court will ordinarily "defer to legislative judgment as to the necessity and reasonableness of a particular measure." *Kendall-Jackson Winery, Ltd. v. Branson*, 82 F. Supp. 2d 844, 875 (N.D. Ill. 2000) (citing *Energy Reserves Grp.*, 459 U.S. at 413). This deference is not absolute, but the court is more likely to defer when the state exercises its general police power, rather than giving a benefit to special interest. *See Energy Reserves Grp.*, 459 U.S. at 412. In considering whether a measure violates the Contracts Clause, the Supreme Court has examined whether it is "sudden, totally unanticipated, and substantial[ly] retroactive[,]" has a "narrow focus[,]" and "invade[s] an area never before subject to regulation by the State[.]" *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 248–50 (1978)

These factors largely weigh in favor of regulation. States have traditionally regulated fire alarm monitoring. Indeed, the *Hinsdale* court specifically found that a municipality has the authority to require connection to a remote supervising station. The court explained that "the Village obviously determined that alarm connections to its fire board would provide a quicker response time[,]" and that this determination was not "unreasonable." *Hinsdale*, 326 Ill. App. 3d

at 382, 761 N.E.2d at 791; *see also Lisle-Woodridge I*, 672 F.3d at 501–02 ("[A] fire district, like a non-home-rule municipal corporation, may mandate a remote supervising system that requires direct connection to the district's own remote supervising station's fire alarm board.").[27] In dicta, the *Hinsdale* court also concluded that the ordinance did not violate the Contracts Clause because it was a "reasonable legislative judgment tailored toward the improvement of the public welfare and safety." *Hinsdale*, 326 Ill. App. 3d at 385, 761 N.E.2d at 794.

Admittedly, Defendants have not provided explicit evidence supporting their contention that the Ordinance actually increases safety. But both the *Hinsdale* court and the *Lisle-Woodridge* court concluded that connection to a central station (without pre-populated computer-aided dispatch, or "CAD"[28]) resulted in slower response times than connection to a remote supervising station. *Lisle-Woodridge II*, 724 F.3d at 867; *Hinsdale*, 326 Ill. App. 3d at 380, 761 N.E.2d at 790. Moreover, Plaintiffs do not dispute that this is true, nor do they dispute that achieving faster response times and better monitoring is a legitimate public purpose. Instead, they contend that the Ordinance is not a reasonable means of achieving that purpose.

The thrust of Plaintiffs' argument is that there are better ways to achieve the public safety benefits, which would allow Plaintiffs to continue operating central stations. For example, in *Lisle-Woodridge*, the court ordered the district to pre-populate information into the CAD, allowing Plaintiffs to automatically retransmit signals to NWCDS (presumably in lieu of making a phone call). (*Cf.* Pls.' Reply 4, 10.) Plaintiffs also point out that Tyco and Plaintiffs use the same or functionally equivalent transmission equipment, suggesting that, at most, Tyco and Plaintiffs provide the same quality of alarm signal monitoring. Similarly, Plaintiffs argue that the

---

[27]     Contrary to the Plaintiffs' claim, the Seventh Circuit did not "flatly reject" the District's safety and faster response time justification for the ordinance in *Lisle-Woodridge.* In fact, the court upheld that ordinance's provision for a remote supervising station. The court rejected the ordinance's requirement that customers get their equipment directly from the district, but that rejection was based on the fact that the district did not have the power to impose such a mandate; it did not address the district's justification for the ordinance. *Lisle-Woodridge I*, 672 F.3d at 502–03.

[28]     Transcript 7:8.

Village can achieve the Ordinance's stated goal of more closely tracking fire alarm systems if the Village simply enforces its fire code rigorously—if the Village does so, Plaintiffs contend, it will know when alarm systems malfunction, because the code requires notification when alarms are down for more than eight hours. Finally, it seems Defendants do not dispute Plaintiffs' contention that the central station model allows alarm companies to better track trouble and supervisory signals (which may indicate that the system requires maintenance) than the remote supervising station option.

All of these may be true, but that would not put the Ordinance in violation of the law; the Ordinance need not provide the *best* way to achieve its public safety goal. In *Lisle-Woodridge*, the court enjoined enforcement of the ordinance that required connection to the district's remote supervising station; the court mandated pre-population in the dispatcher's computers instead. *Lisle-Woodridge II*, 724 F.3d at 872. But there, the court found that the Lisle-Woodridge system did not meet NFPA 72 requirements—standards that are effectively mandatory for fire protection districts, though not for municipalities. *Cf. Lisle-Woodridge I*, 672 F.3d at 500. Specifically, the court found that the Lisle-Woodridge system was less reliable than the central station model. *Lisle-Woodridge II*, 724 F.3d at 866–67, 871. Plaintiff has not identified any such problems with the Schaumburg system.[29] A municipality is within its rights to choose between two reasonable monitoring alternatives.[30] Indeed, there are other apparent benefits of the Ordinance: it eliminates the need for a phone call to NWCDS, and it allows NWCDS to directly monitor fire alarms, rather than rely on central stations which may experience outages. (See Tyco Surreply 8.)

---

[29]    Plaintiffs do point out that NFPA 72 requires that property owners who use a remote supervising station be responsible for activities "related" to signal transmission, such as "equipment installation, inspection, testing, and maintenance," (*NFPA 72* § 3.3.282.3 (2016 ed.), Ex. D to Compl), but Plaintiffs do not explain how the Village's system violates this provision.

[30]    Plaintiffs do not claim that central station monitoring results in more effective monitoring, and do not address the evidence that ADS itself suffered an outage in fall 2016. *See* Bosch, *supra* note 8.

Plaintiffs also claim that the Village's requirement contravenes NFPA 72, "which provide[s] that building owners have the right to choose the supplier of their alarm transmission equipment." (Compl. ¶ 20.) There are several problems with this argument: first, Plaintiffs have not cited to or provided the relevant provisions of NFPA 72, and second, as explained above, it is not clear from the record whether customers must utilize Tyco's *transmission* equipment or merely its *receiving* equipment. Finally, even if Plaintiffs' claim is true, *Hinsdale* specifically held that Illinois municipalities are not required to adhere to national building codes in establishing their own fire codes—they may choose to adopt only portions of those national codes. *Hinsdale*, 326 Ill. App. 3d at 380, 761 N.E.2d at 789. Again, Plaintiffs do not explain why effectively declining to adopt an unspecified provision of NFPA 72 that requires customer choice of transmission-equipment provider is unreasonable. Because Plaintiffs have not explained why the Ordinance is an unreasonable way to achieve faster response times and more direct monitoring, the court cannot conclude that Plaintiffs are likely to succeed on the merits of their Contracts Clause claim.

### B.    Fourteenth Amendment

Next, Plaintiffs argue that their due process rights are violated by the Ordinance, in that it prevents them from utilizing the licenses that they have been granted under the Illinois Alarm Act. A license to engage in a business is a property right, and an ordinance that limits the ability to engage in a licensed business can violate due process. *Orland I*, 194 F. Supp. 3d at 724 (quoting *Reed v. Village of Shorewood*, 704 F.2d 943, 949 (7th Cir.1983), *overruled on other grounds by Brunson v. Murray*, 843 F.3d 698, 713 (7th Cir. 2016)). A regulation violates due process if it is arbitrary or irrational. *Frey Corp. v. City of Peoria*, 735 F.3d 505, 508 (7th Cir. 2013). Put another way, the regulation must be rationally related to a legitimate government interest. *Id.*

Again, Plaintiffs do not suggest that public safety or faster response times is not a legitimate government interest. They nevertheless argue that the Ordinance is arbitrary and

irrational for several reasons.  First, they urge that there are less restrictive means of achieving the purported public safety benefits of the Ordinance, such as the pre-population described above.   But the fact that there are other ways to achieve the public safety goals of the Ordinance does not mean that the Ordinance will not also achieve these goals.  That requiring a remote supervising station is not the *best* means to make response times faster does not mean it is not a *rational* means.

Second, Plaintiffs contend that the fact that some customers can delay the requirement to connect to NWCDS with permission from the fire chief undercuts the public safety rationale of the Ordinance.  Again, the court disagrees.  The Ordinance permits a delay in transition only upon a case-by-case determination that delay will not unduly jeopardize public safety.  If the court were to accept Plaintiffs' challenge on this basis, then the mere fact that the Ordinance will not be fully implemented until 2019 would defeat the public safety justification.  The court declines to adopt such an interpretation.  Legislatures have the freedom to find a balance between the goals of faster response times, greater monitoring, and fewer out-of-service alarms on one hand, and the cost, inconvenience, and disruption of the transition on the other.  The fact that the Village has made a judgment about the appropriate balance, but makes exceptions where appropriate on a case-by-case basis, does not make the Ordinance irrational.

Third, Plaintiffs complain again that the Ordinance violates the Schaumburg fire code, because it will deny Commercial Accounts the right choose their own providers of transmission equipment.  As noted above, whether Commercial Accounts will be required to purchase Tyco's transmission services is not clear from the record.  Moreover, athough the Village has nominally adopted all of NFPA 72, it is not required to do so; and passing an Ordinance which may conflict with one provision is simply a *de facto* repudiation of that one provision within the fire code. Plaintiffs have not explained why the Village's decision to do so is irrational.[31]

---

[31]     Plaintiffs also cite a 2001 letter from the Illinois attorney general "specifically address[ing]" the right to operate a licensed business.   This letter merely addresses the

Plaintiffs also allege an equal protection claim, on the grounds that Plaintiffs are being treated differently than Tyco for no valid reason. Plaintiffs make no mention of this claim in their briefs. There is no basis on which the court could conclude that Plaintiffs are part of a suspect class, or have been deprived of a fundamental right. Accordingly, they can prevail on an equal protection claim only if they prove they have "been intentionally treated differently from others similarly situated and there is no rational basis for the difference in treatment." *Orland II*, 194 F. Supp. 3d at 723 (quoting *Srail v. Village of Lisle*, 588 F.3d 940, 943 (7th Cir.2009)). The Ordinance itself does not treat different fire alarm companies differently, and Plaintiffs have not alleged that the Village passed the Ordinance in order to take advantage of NWCDS's exclusive agreement with Tyco or to cut other companies out of the market. Plaintiffs are not likely to succeed on their Fourteenth Amendment claims against the Village.

### C.     Tortious Interference with Contract

Plaintiffs also assert claims of tortious interference with contract and tortious interference with prospective economic advantage. Tortious interference with contract requires a showing of "(1) the existence of a valid and enforceable contract between the plaintiff and a third party, (2) that defendant was aware of the contract, (3) that defendant intentionally and unjustifiably induced a breach of the contract, (4) that the wrongful conduct of defendant caused a subsequent breach of the contract by the third party, and (5) that plaintiff was damaged as a result." *Bank Fin., FSB v. Brandwein*, 2015 IL App (1st) 143956, ¶ 43, 36 N.E.3d 421, 430 (internal citation and quotation marks omitted). Success in a claim of tortious interference with prospective economic advantage requires "(1) plaintiff must have a reasonable expectancy of a valid business relationship; (2) defendant must know about it; (3) defendant must intentionally interfere with the expectancy, and so prevent it from ripening into a valid business relationship;

---

existence of the right, which Defendants do not dispute (Ex. C to Pls.' Mem. [9]); it does not address the justification for this Ordinance or whether the Ordinance is arbitrary or unreasonable.

and (4) intentional interference must injure the plaintiff." *Schuler v. Abbott Labs.*, 265 Ill. App. 3d 991, 994, 639 N.E.2d 144, 147 (1st Dist. 1993).

The Village first claims it has immunity from these claims under 745 ILCS 10/2-103, which grants immunity to a local government for adopting laws. But this immunity applies only to actions for damages, not for injunctive relief. 745 ILCS 10/2-101. The Village's claims that Plaintiffs cannot show that the Village was aware of the contracts also falls flat: the Village sent notices to Plaintiffs' customers, requiring customers to send information about "existing monitoring services that your business may utilize[.]" (Notice, Ex. H to Compl.) The Village was certainly aware that customers had existing contracts with monitoring companies other than Tyco.

The tortious interference claims are unlikely to succeed, however, for a different reason. Such claims ordinarily require "that the defendant has committed some impropriety in" the interference. *Dowd & Dowd, Ltd. v. Gleason*, 181 Ill. 2d 460, 485, 693 N.E.2d 358, 371 (1998). Plaintiff has not shown any improper motive; rather, the Ordinance's explicit object is public safety. Nor did the Village completely ignore difficulties generated by compliance; the Ordinance allows conversion requirements to be extended for Commercial Accounts with existing contracts, presumably to mitigate the impact on existing contracts. The court recognizes that Plaintiffs would reasonably have expected their existing customers to renew their contracts. But Plaintiffs have not presented evidence to seriously dispute that public safety, not some improper motive, is the reason for the Ordinance. Without this, Plaintiffs are unlikely to succeed on the merits of their tortious interference claims.[32]

---

[32] The Village also argues that Plaintiffs should have identified specific third parties with whom it has contracts or prospective contracts. *See Schuler*, 265 Ill. App. 3d at 994, 639 N.E.2d at 147. The court does not agree that Plaintiffs are required to identify hundreds of customers at this stage. Defendants do not seriously dispute that Plaintiffs have these existing contractual relations. And Plaintiffs have in fact identified two customers who stated that they were declining to renew their contracts specifically because of the Ordinance.

III.   **Contracts Clause, Fourteenth Amendment, and Tortious Interference Claims against NWCDS and Tyco**

As with the antitrust claims, the remaining claims against NWCDS and Tyco are unlikely to succeed because they do not allege that NWCDS and Tyco did anything other than sign the 2011 NWCDS/Tyco Agreement, which Plaintiffs concede is legal.  In particular, a claim under the Contracts Clause is violated only when a state law impairs the obligations of contracts.  U.S. CONST. art. I, § 10, cl. 1; *cf. N. Pac. Ry. Co. v. Minnesota*, 208 U.S. 583, 590 (1908); *Peick v. Pension Ben. Guar. Corp.*, 724 F.2d 1247, 1263 (7th Cir. 1983).  But, as explained above, there is no evidence that NWCDS or Tyco had involvement in the passage of the Ordinance.  This absence of evidence similarly dooms the due process claim, because Plaintiffs lost their ability to compete in Schaumburg only after the Ordinance was passed.[33]  As for the equal protection claim, selecting a contractor to provide equipment "does not violate the Equal Protection Clause when government actors merely exercise their discretion."  *Orland II*, 194 F. Supp. 3d at 724 (citing *Higgins Elec., Inc. v. O'Fallon Fire Prot. Dist.*, 813 F.3d 1124, 1129 (8th Cir. 2016) and *Corey Airport Servs., Inc. v. Clear Channel Outdoor, Inc.*, 682 F.3d 1293, 1298 (11th Cir. 2012)).

It is worth emphasizing that the NWCDS/Tyco Agreement alone does not interfere with any existing contracts or prospective business advantage.  True, Plaintiffs claim that one customer decided to terminate its contract after being solicited by Tyco, but soliciting customers is lawful and expected activity for any business.  Plaintiffs argue that the court should nevertheless consider the actions of NWCDS and Tyco as evidence of tortious activity because the NWCDS/Tyco agreement was not "in full force" until the Ordinance was passed.  (Pls.' Reply 13.)  This is disingenuous; the NWCDS/Tyco agreement was certainly "in full force" before the Ordinance, because customers could not use the remote supervising station between

---

[33]      The *Orland* court decided this issue on different grounds.  There, the court found that the Du-Comm/Tyco Agreement was not exclusive, and dismissed the due process and equal protection claims on that basis.

2011 and 2016 without using Tyco as a service provider.  There is no evidence that NWCDS or Tyco were involved in passing the Ordinance, and the agreement between them is not unlawful.

Thus, because the court determines that, at this stage, Plaintiffs are unlikely to succeed on the merits of their claims, the court denies the motion for a preliminary injunction.  The court need not reach Defendants' other arguments, but notes that NWCDS's and Tyco's laches defense may have merit; Plaintiffs did not bring this suit, seeking a TRO and preliminary injunction, for more than six months after the Ordinance passed.  Defendants also argue that Plaintiffs' damages (available against NWCDS and Tyco, but not the Village, *see* 745 ILCS 10/2-101, -103) would be quantifiable.  (NWCDS Resp. 10–12; Village Resp. 10; Tyco Surreply 9).  In particular, Tyco points out that in the *Orland* case, Plaintiff ADS presented evidence quantifying its damages.  (Tyco Surreply 9; Decl. of Erica Dressler, Ex. F to Tyco Surreply [46-1] at ¶¶ 4–5.)  Whatever the strength of this argument, the court notes that Plaintiffs may of course seek alternative forms of relief.  FED. R. CIV. P. 8(a)(3).

## CONCLUSION

For the reasons stated above, Plaintiffs' motion for a preliminary injunction [8] is denied. If Plaintiffs wish to amend their complaint, they have leave to do so within 21 days.

ENTER:

Dated:        August 31, 2017

_____
REBECCA R. PALLMEYER
United States District Judge