# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

ALARM DETECTION SYSTEMS, INC., an
Illinois corporation; ILLINOIS ALARM
SERVICE, INC., an Illinois corporation;
D.M.C. SECURITY SERVICES, INC.,
a Illinois corporation; NITECH FIRE &
SECURITY INDUSTRIES, INC., an Illinois
corporation; SMG SECURITY SYSTEMS,
INC., an Illinois corporation; and ACADIAN
MONITORING SERVICES, LLC, a Louisiana
limited liability corporation,

        Plaintiffs,

    v.

THE VILLAGE OF SCHAUMBURG, a
municipal corporation; TYCO INTEGRATED
SECURITY LLC, a Delaware limited liability
company; and NORTHWEST CENTRAL
DISPATCH SYSTEM, an intergovernmental
cooperation association,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 17 C 2153

Judge Rebecca R. Pallmeyer

## MEMORANDUM OPINION AND ORDER

Plaintiffs are companies that provide fire alarm monitoring services to commercial and multifamily buildings in the Village of Schaumburg. (Verified Compl. ("VC") [1] ¶¶ 1, 2.) They allege that Defendants Schaumburg, Tyco Integrated Security, LLC ("Tyco"), and Northwest Central Dispatch System ("NWCDS") committed antitrust violations, state law torts, and violated Plaintiffs' Constitutional rights through an "illegal anticompetitive and monopolistic scheme" that injured both Plaintiffs and the Schaumburg market. (*Id.* at ¶¶ 7, 25–26.)

As described more fully in an opinion issued last year, *see Alarm Detection Sys. Inc., v. Village of Schaumburg*, No. 17 C 2153, 2017 WL 3780279 (N.D. Ill Aug. 31, 2017), Defendant NWCDS dispatches emergency services in response to alarm signals sent from "central stations," such as the ones operated by Plaintiffs, or from transmitters that send alarm signals directly to NWCDS. Since 2011, NWCDS has been a party to an agreement with Defendant Tyco in which

Tyco operates the fire alarm monitoring station owned by NWCDS. In 2016, the Village of Schaumburg adopted an ordinance requiring most commercial buildings in Schaumburg to transmit signals wirelessly to the NWCDS "remote supervising station" by August 31, 2019. This meant, effectively, that Schaumburg businesses and multifamily residential buildings would have to send signals directly to Tyco's receiving equipment, and allegedly has resulted in Plaintiffs' losing customers for the alarm monitoring services they provide.

Plaintiffs moved for a preliminary injunction against enforcement of the ordinance. For reasons explained in the court's August 31, 2017 opinion, that motion was denied. Plaintiffs now move for reconsideration of that ruling [68]. Defendants oppose that motion and have renewed their own earlier motions to dismiss the complaint ([79], [81], [84]). For the reasons stated below, Plaintiffs' motion for reconsideration is denied and Defendants' motions to dismiss are granted in part.

## BACKGROUND[1]

Plaintiffs' business involves receiving, monitoring, and handling fire alarm signals that originate from commercial and multifamily buildings in Schaumburg ("Commercial Accounts"). (VC [1] ¶¶ 2, 49–50.) The Plaintiff companies "either operate their own supervising stations," where they monitor alarm signals, or they "contract with third-party supervising stations to receive the Signals and monitor the fire alarm systems of [Plaintiffs'] customers." (*Id.* at ¶ 1.) When a signal is received at Plaintiffs' supervising stations, "a phone call . . . [is] made from the supervising station to NWCDS, which operates a 911 center and dispatches emergency personnel as necessary for Schaumburg." (*Id.* at ¶ 12.) Plaintiffs also sell, lease, install, and maintain alarm signal transmission devices. (*Id.* at ¶ 2.) In March 2017, Plaintiffs alleged that they had "over four hundred Commercial Accounts in Schaumburg." (*Id.* at ¶ 75.)

---

[1] The court engaged in a detailed discussion of the facts of this case in its prior Order [65]. It presumes the reader's familiarity with those facts and provides only a summary here.

Plaintiffs filed this action after Defendant Schaumburg passed Ordinance No. 16-078 ("the Ordinance") on August 23, 2016, "requiring that all Commercial Accounts in Schaumburg use the supervising station operated by Defendant Northwest Central [Dispatch System]." (*Id.* at ¶ 4.) The Ordinance, in part, provides that:

> All new fire alarm and fire suppression systems shall transmit fire, supervisory, and trouble signals to the Village of Schaumburg's designated remote supervising station via a wireless transmitter . . .
>
> All existing fire alarm and fire suppression systems shall transmit fire, supervisory, and trouble signals to the Village of Schaumburg's remote supervising station via a wireless transmitter . . . when any of the following occurs:
>
> > a. When an existing contract with a monitoring agency (central station) ends.
> > b. When the existing fire alarm equipment is modified or replaced.
> > c. Prior to August 31, 2019.

(*Id.* at Ex. B, at 9.) While extensions beyond the August 2019 deadline may be granted "upon a determination by the Fire Chief that the public safety is not affected," in no case can extension be granted beyond 2021. (*Id.*) In Schaumburg, the designated remote supervising station is NWCDS. (VC [1] ¶ 4, Ex. B at 4.)

At the time the Ordinance was passed, NWCDS was nearly five years into a ten-year agreement with Defendant Tyco. That agreement gave "Tyco the exclusive right to install, own, maintain, and service all alarm signal receiving and processing equipment" at NWCDS. (VC [1] ¶¶ 15, 64.) On September 27, 2016, Defendant Schaumburg's Fire Chief sent out a letter ("Notice") to "Fire Alarm User[s]," notifying them of the Ordinance. The Notice explained that the Ordinance would "eventually require all fire alarm systems in the village to be monitored by the 911 center at Northwest Central Dispatch System" and that "[a]ll conversions of the new monitoring services must be complete prior to August 31, 2019." (*Id.* at Ex. H.) The letter also informed users that "[t]he NWCDS-contracted fire alarm vendor, Tyco Integrated Security, is the authorized installer of the radio equipment required for fire alarm systems monitored by NWCDS. Further information regarding system requirements can be provided by NWCDS." (*Id.*)

The combined effect of the Ordinance, the Agreement, and the Notice, plaintiffs assert, is that they "will lose all of their Business in the Schaumburg Market[,] and the Commercial Accounts in the Schaumburg Market will be deprived of their choice of fire alarm contractors, resulting in higher costs than a competitive market." (VC [1] ¶ 120.) Plaintiffs assert that they have already lost some customers "based solely on the new Village of Schaumburg ordinance" (*id.* at ¶ 77), and that their contracts with other customers will be affected in the future. (*Id.* at ¶¶ 76–79; Exs. I, J.)

In its August 2017 opinion, this court denied Plaintiffs' motion for a preliminary injunction. *Alarm Detection*, 2017 WL 3780279. The court concluded, inter alia, that Plaintiffs had not established a likelihood of success on their antitrust claims, *id.* *10–12; had not shown that the Ordinance was unsupported by a legitimate purpose or violates regulatory standards, *id.* *14, 16; had not established that they were entitled to injunctive relief for violations of their due process or equal protection rights, *id.* *16-17; and had not established that any interference with their contractual expectations was improperly motivated. *Id.* *17. The court also noted the possibility that Plaintiffs' damages, if any, from the alleged violations are quantifiable. Id at *18.

## DISCUSSION

### I.   Motion for Reconsideration

A motion for reconsideration is not expressly provided for by the Federal Rules of Civil Procedure, but the Seventh Circuit has construed Rule 59(e) to permit such motions. *See Obriecht v. Raemisch*, 517 F.3d 489, 493–94 (7th Cir. 2008) (explaining that "a motion for reconsideration on errors of law" is "encompassed by Rule 59(e)") (citing *Osterneck v. Ernst & Whinney*, 489 U.S. 169, 174 (1989)); FED. R. CIV. P. 59(e) ("A motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment."). Such a motion allows district courts to take a second look at their decisions, but only within narrow bounds. *See Quaker Alloy Casting Co. v. Gulfco Indus., Inc.*, 123 F.R.D. 282, 288 (N.D. Ill. 1988) ("[T]his Court's opinions are not intended as mere first drafts, subject to revision and reconsideration at a litigant's

pleasure."). A request for reconsideration requires the movant to identify "a manifest error of law or fact or present newly discovered evidence." *Vesely v. Armslist LLC*, 762 F.3d 661, 666 (7th Cir. 2014) (internal quotation marks and citation omitted). A motion for reconsideration "may not be used to raise novel legal theories that a party had the ability to address in the first instance," *Russell*, 51 F.3d at 749 (citation omitted), nor may a motion for reconsideration "be used to 'rehash' previously rejected arguments." *Vesely*, 762 F.3d at 666 (citing *Oto*, 224 F.3d at 606 (7th Cir. 2000)). As the Seventh Circuit recognizes, a Rule 59(e) motion is "appropriately used to fix errors," *Miller v. Safeco Ins. Co. of Am.*, 683 F.3d 805, 815 (7th Cir. 2012) (citing *Moro v. Shell Oil Co.*, 91 F.3d 872, 876 (7th Cir. 1996), but does not "provide a vehicle for a party to undo its own procedural failures, and it certainly does not allow a party to introduce new evidence or advance arguments that could and should have been presented to the district court prior to the judgment." *Moro,* 91 F.3d at 876.

### A.  Plaintiffs' Challenge to the Court's Findings

In support of their motion, Plaintiffs assert that the court "made incorrect factual findings despite the 'largely undisputed' allegations of the Verified Complaint." (Pls.' Memo. in Support of their Motion for Reconsideration ("Pls.' Memo in Support") [69], at 1 (citing Order [65], at 2).) [2] Respectfully, however, every factual issue they point to is either an attempt to cast their pleadings in a new light or would not require a different ruling on Plaintiff's motion for a preliminary injunction.

First, Plaintiffs present no new evidence with their motion for reconsideration. They do direct the court's attention to national fire code standards issued by the National Fire Protection Association and referred to as NFPA 72. (*See* Pls.' Memo. in Support [69], at 3–4 (pointing to specific sections of the NFPA 72 and the NFPA Handbook).) But these are not "newly discovered"

---

[2]  In the alternative, Plaintiffs argue that the court should have held an evidentiary hearing. (Pls. Motion for Reconsideration [68] at ¶ 4). The court did hear oral arguments on the issue of the preliminary injunction (Transcript [49]), and Plaintiffs have not explained how evidence would have changed things. As both sides appear to recognize, their dispute is largely legal, not factual. (Pls.' Memo. in Support of their Motion for Reconsideration [69], at 1 (noting the "largely undisputed" allegations of the Verified Complaint) (citing Order [65], at 2).)

facts, and Plaintiffs do not explain why they were not cited in their Verified Complaint, their earlier memoranda, or at oral argument [49]. Thus, rather than presenting new evidence, Plaintiffs must argue that the court labored under a manifest misunderstanding of the facts. As the court understands their positions, none of the court's own purported misunderstandings warrant reconsideration.

First, Plaintiffs contend that the court erroneously believed that Plaintiffs' central stations were not *also* remote supervising stations under the terms of the NFPA 72. (Pls. Memo in Support [69], at 3–4; *Alarm Detection*, 2017 WL 3780279 at *2.) The court does not comprehend the relevance of this purported misunderstanding. The fact that Plaintiffs may also operate remote supervising stations makes no difference to the court's prior reasoning; the Schaumburg Ordinance selects NWCDS as Schaumburg's designated remote supervising station. (VC [1] Ex. B, at 4, 9.)

Plaintiffs' second contention—that the court "disregarded evidence that Plaintiffs can . . . eliminate the phone call" (and any resulting delay in transmitting messages from Plaintiffs' stations to NWCDS)—fails on its face. (Pls.' Memo in Support [69], at 5.) The court clearly took that allegation into account. (*Alarm Detection*, 2017 WL 3780279 at *3 (citing VC ¶ 56).) *See Vesely*, 762 F.3d at 666 (advising that a motion for reconsideration should not "be used to 'rehash' previously rejected arguments") (citation omitted).

Plaintiffs next argue that, while the court "considered the requirement for Commercial Accounts to use Tyco transmitters to be a disputed fact . . . the facts clearly demonstrate that . . . the Village imposes this requirement on Commercial Accounts." (Pls.' Memo in Support [69], at 6). The suggestion that this is undisputed is mystifying. (*Compare* Pls.' Memo. in Support [69], at 6 *with* Transcript [49], at 26:9–27:1). The court is not required to definitively decide every issue at the preliminary injunction stage and has not done so in this case. *See Bowles v. Montgomery Ward & Co.*, 143 F.2d 38, 42 (7th Cir. 1944) (on a motion for preliminary injunction, "[t]he court is not required to finally determine the issues of law or the issues of fact involved in the case").

Plaintiffs are also troubled by what they deem the court's incorrect finding "that there are public safety differences between Plaintiffs' supervising stations and NWCDS." (Pls. Memo. in Support [69], at 10.) In fact, the court merely stated that "some factual questions in this case remain uncertain" regarding "the safety of the proposed options." (*Alarm Detection*, 2017 IL 3780279, at *6)—hardly a "patent misunderstanding."

Plaintiffs argue that the court misunderstood the way signals could be sent from their monitoring stations to NWCDS. As this court understands Plaintiffs' position, they contend that they have the technological capability to send alarm signals directly from their central stations to a computer at NWCDS without the need to send the signal through a Tyco receiver at NWCDS and without the need to place a phone call to NWCDS. (Pls.' Memo. in Support [69], at 7 ("Signals sent by automatic retransmission can go directly to the alarm computer at NWCDS, bypassing the Tyco receiving equipment, and without the need to install any receiving equipment [at NWCDS") (citing VC ¶ 56; Ex. DD to Hearing).) This, they suggest, would satisfy the safety goals that Schaumburg purports to address through its ordinance. However, Plaintiffs have already made this argument. (*See* Pls.' Reply Memorandum of Law in Support of their Emergency Motion for a Temporary Restraining Order and Preliminary Injunction [42], at 10 (arguing that the time required to make a phone call from a central station to a 911 center "can be easily bridged with simple changes at the NWCDS' [sic] 911 center or the use of new technology available to Alarm Companies").) Further, Plaintiffs fail to recognize that, while they may have the capability to automatically re-transmit signals to NWCDS, they were not doing so at the time the Ordinance was passed. The court did not patently misunderstand Plaintiffs' technological capabilities, nor will it reconsider the denial of their motion for a preliminary injunction on these grounds.

Plaintiffs contend that the court's "finding" that Plaintiffs are free to lease Tyco equipment "disregard[ed] the economic realities of the market for the Business." (Pls.' Memo. in Support

[69], at 7.) The court's statement was no factual "finding," however; it was a statement about the law.[3]

Plaintiffs next assert that the court misapprehended the requirements of NFPA 72 regarding customer choice of transmission equipment. In fact, however, the court specifically recognized that "Illinois municipalities are not required to adhere to national building codes in establishing their own fire codes—they may choose to adopt only portions of those national codes." (*Alarm Detection*, 2017 WL 3780279 at *16, citing *Hinsdale*, 326 Ill. App. 3d 372, 380, 761 N.E.2d 782, 789 (2nd Dist. 2001)).

Finally, Plaintiffs contend that "the [c]ourt appeared to accept Defendants' contention that vulnerability to a service outage was unique to ADS." (Pls.' Memo. in Support [69], at 11 (citing Order [65], at 5).) The language Plaintiffs cite provides no support for this contention. Presumably their concern rests on footnote 8 of the Order, where the court simply notes that "Tyco has attached . . . a news article concerning the failure of thousands of transceivers installed in Plaintiff ADS's customers . . . after the Ordinance was passed." (VC [1], at 5 n.8.) Nothing about that footnote supports Plaintiffs' contention that the court found that service vulnerabilities are unique to ADS.

### B. Plaintiffs' Challenge to the Court's Legal Analysis

Plaintiffs' contentions regarding the court's legal conclusions fare no better. First, they assert that the court's determination that the Village of Schaumburg is likely shielded from state-action immunity "is simply incorrect." (Pls. Memo in Support [69], at 12.) The court carefully considered Plaintiffs' arguments regarding *Cmty. Commc'ns Co. v. City of Boulder*, 455 U.S. 40, 52 (1982) and *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 43 (1985) in its earlier opinion

---

[3] The court finds it unnecessary to address several of Plaintiffs' arguments. (Pls.' Memo in Support [69], at 8 §§ F, G.) Plaintiffs argue that they "clearly set out [ ] uncontested" facts showing that "the village and NWCDS will receive approximately $300,000 as a result of the Defendants' scheme" and that Tyco will be able to charge $81 per month to Commercial Accounts. (*Id.* at 8). The court placed no reliance in its Order on these issues and finds no need to address them here.

and declines to revisit those arguments. (*Alarm Detection*, 2017 WL 3780279, at *10-11.) Plaintiffs also make the puzzling suggestion that the court erred in rejecting NWCDS's state-action immunity argument (Pls. Memo. in Support [69], at 15 (citing [19], at 8)); presumably they intended to argue that the court erred in *accepting* that argument. (*See, for example*, Pls. Memo in Support [69], at 15, § III.B ("NWCDS is Not Immune Because it is Not Subject to State Supervision").) In fact, the court neither rejected nor accepted NWCDS's state-action arguments. (*Alarm Detection*, 2017 WL 3780279, at *12 (finding Plaintiffs unlikely to succeed against NWCDS due Plaintiffs failure to allege necessary elements of their antitrust claims); *id.* at n.25 (noting that the state-action immunity doctrine's application to NWCDS is uncertain).).

Plaintiffs complain that the court erred in "accepting Defendants' unsupported safety justification" for the Village's Ordinance "at face value." (Pls' Reply in Support [89], at 6.) Again, the court's opinion defeats this concern: the court stated that "Defendants have not provided explicit evidence supporting their contention that the Ordinance actually increases safety." (*Alarm Detection*, 2017 WL 3780279, at *15.) Plaintiffs' remaining arguments regarding their likelihood of success under the Contracts Clause are arguments the court already heard and considered. (*See* Pls.' Reply in Support [89], at 7–9 (re-stating arguments regarding their own capabilities for automatic signal retransmission and the alleged equivalency between automatic retransmission and direct connect); (*Alarm Detection*, 2017 WL 3780279, at *14).)

Finally, for the first time, on the motion for reconsideration, Plaintiffs argue that the Village's *enforcement* of the Ordinance—not its *enactment*—violates their rights. (Pls.' Memo in Support [69], at 2 ("Can the Alarm Companies . . . comply with the Ordinance? Yes, they are doing so now."); Pls.' Reply in Support [89], at 9 ("The Village simply does not enforce the Ordinance as written.").)[4] Because Plaintiffs make this argument for the first time on their motion for reconsideration, the court declines to address it.

---

[4] In previous filings and arguments in front of the court, the Plaintiffs argued that the Ordinance itself "represents arbitrary and capricious regulation of the Alarm Companies," (Pls.'

Plaintiffs' motion for reconsideration is denied.

## II.     Motions to Dismiss

### A.     Legal Standard

Defendants argue that Plaintiffs have failed to state a claim upon which relief can be granted and move the court to dismiss pursuant to FED. R. CIV. P. 12(b)(6).[5] When reviewing a 12(b)(6) motion to dismiss, the court must "tak[e] all well-pleaded allegations of the complaint as true and view[ ] them in the light most favorable to the plaintiff." *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011) (citation omitted). To survive a 12(b)(6) motion, "a complaint must provide a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Arnett*, 658 F.3d at 751 (citing *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam); FED. R. CIV. P. 8(a)(2)). That short and plain statement must be "sufficient to provide the defendant with 'fair notice' of the claim and its basis." *Arnett*, 658 F.3d at 751 (citing *Erickson*, 551 U.S. at 93).

A plaintiff "must always . . . allege 'enough facts to state a claim to relief that is plausible on its face.'" *Limestone Dev. Corp. v. Vill. of Lemont,* 520 F.3d 797, 803 (7th Cir. 2008) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007)). "[H]ow many facts are enough will depend on the type of case. In a complex antitrust or RICO case a fuller set of factual allegations . . . may be necessary to show that the plaintiff's claim is not 'largely groundless.'" *Limestone*, 520

_____

Reply Memorandum of Law in Support of their Emergency Motion for a Temporary Restraining Order and Preliminary Injunction [42], at 4), and noted the "arbitrary and capricious nature of how [Defendants] set up their system." (Transcript [49], at 23, 6:6–7). They also asserted that "[t]he arrangement between Defendants, which effectively excludes Plaintiffs from engaging in the Business as they would in an open market, is arbitrary and capricious." (VC [[1], at 167.). All of these arguments indicate that the Plaintiffs are challenging the Ordinance itself, not the manner in which it is enforced.

[5]      Defendants Village and NWCDS adopt and incorporate each other's motions to dismiss and supporting memoranda, as well as those of Tyco. (Defendant Village of Schaumburg's Memorandum in Support of its Motion to Dismiss (hereinafter "Schaumburg Memo in Support of MTD") [56], at 2 n.1; Defendant Northwest Central Dispatch System's Memorandum in Support of Motion to Dismiss (hereinafter "NWCD Memo in Support of MTD") [54], at 2 n.1.) Therefore, the court will treat Defendants' arguments together unless otherwise indicated in this opinion.

F.3d at 803 (citing *Phillips v. County of Allegheny*, 515 F.3d 224, 231–32 (3d Cir. 2008)). Ultimately, a complaint must contain "more than labels and conclusions." *Pugh v. Tribune Co.*, 521 F.3d 686, 699 (7th Cir. 2008). "[T]he complaint must establish a nonnegligible probability that the claim is valid." *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 629 (7th Cir. 2010) (discussing the implications of *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) on pleading requirements).

Plaintiffs' Verified Complaint asserts eight claims: violation of the U.S. Constitution's Contracts Clause, violation of Sherman Act §§ 1, 2, violation of Clayton Act § 7, violations of the Fourteenth Amendment's substantive due process and equal protection provisions, tortious interference with contract, tortious interference with prospective economic advantage, and unjust enrichment. The court addresses them in turn.

### B.    Contracts Clause Claim

The Contracts Clause of U. S. Constitution "prohibits any state 'Law impairing the Obligation of Contracts.'" *Sveen v. Melin*, 138 S. Ct. 1815, 1821 (2018) (citing U.S. Const. Art. I, § 10, cl. 1). "A contracting party may invoke the protections of the Contract Clause when there is an exercise of legislative power" that impairs the party's contract rights. *Yellow Cab Co. v. City of Chicago*, 3 F. Supp. 2d 919, 922 (N.D. Ill. 1998). Thus, as a threshold matter, the court must address Defendants Tyco and NWCDS' contentions that the Contracts Clause claim against them must be dismissed because they are not engaged in the exercise of such power.

The arguments have merit. Plaintiffs have made no allegations that Tyco was involved the passage of the Ordinance. As for NWCDS, Plaintiffs argue that NWCDS "is acting in concert with the Village to violate Alarm Companies' constitutional rights" and that it can therefore be held liable for a Contracts Clause violation. (Alarm Companies' Combined Response in Opposition to Defendants' Rule 12(b)(6) Motion to Dismiss ("Pls.' Response to Dfs.' MTD") [92], at 13.) This conclusory allegation does not support a plausible inference that NWCDS was involved in the passage of the Ordinance. Plaintiffs merely argue that NWCDS was working "hand in glove with the Village and Tyco," citing ¶ 116 of the Complaint. In that paragraph, Plaintiffs allege that "[t]he

Ordinance and Exclusive Agreement require all Commercial Accounts to terminate their Customer Contracts with Plaintiffs and other private alarm contractors and to contract with Tyco. As such, the Defendants' conduct substantially and permanently impairs Plaintiffs' existing contractual relationships." This allegation sets forth a legal conclusion, not facts establishing a plausible claim for relief. Thus, the Contracts Clause claim is dismissed as against both Tyco and NWCDS.[6]

Defendant Schaumburg clearly did take legislative action. The passage of an ordinance that affects or impairs a contract is not by itself sufficient to establish a Contracts Clause violation, however. Instead, the court must first ask "whether the state law has 'operated as a substantial impairment of a contractual relationship.'"[7] *Sveen*, 138 S. Ct. at 1821–22 (citing *Allied Structural Steel Co.*, 438 U.S., at 244, 98 S.Ct. 2716). If the court determines that the law imposes a substantial impairment, the court next determines "whether the adjustment of the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption." *Energy Reserves Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 412 (1983) (internal quotation marks and citation omitted).

---

[6]    Elsewhere in Plaintiffs' briefing on the motion to dismiss, it becomes apparent that a key piece of evidence for their position is a September 27, 2016 letter sent by the Village's Fire Chief to a "Fire Alarm User." (VC [1] Ex. H.) Plaintiffs do not explicitly point to that letter when they argue that Tyco and NWCDS are liable for a Contracts Clause violation. Still, this court considered the implications of that letter. As discussed below, the court does not find the letter sufficient to raise a plausible inference that NWCDS or Tyco were involved in the passage of the Ordinance.

    Further, the court need not determine here whether NWCDS is an entirely separate governmental public agency or not, given that Plaintiffs fail to plead sufficient facts implicating NWCDS' involvement with the Ordinance. (See Alarm Companies' Combined Response in Opposition to Defendants' Rule 12(b)(6) Motion to Dismiss ("Dfs.' Response to MTD") [92], at 13; Df. NWCDS' Memo. in Support of MTD [54], at 14.)

[7]    The parties refer to a 1981 case in which the Seventh Circuit construed the Contract Clause test as a "three-step inquiry." *Chicago Bd. of Realtors, Inc. v. City of Chicago*, 819 F.2d 732, 736 (7th Cir. 1987). More recently, however, the Supreme Court has articulated the test as having two steps, s*ee Sveen*, 138 S. Ct., at 1818. Substantively, these tests do not differ.

The parties dispute whether the Ordinance's enactment caused a substantial impairment to Plaintiffs' contractual relationships. Schaumburg argues that "a simple reading of the Ordinance itself demonstrates termination of any contract is not required." (Def. Village of Schaumburg's Memorandum in Support of its Motion to Dismiss ("Schaumburg's Memo in Support of MTD") [56], at 5). Plaintiffs appear to accept that reading of the Ordinance: they concede that "the Ordinance is facially neutral," but contend that "its implementation by the Village's Notice is clearly coercive." [92], at 13–14 (citing VC ¶¶ 4, 14, Ex. E).[8] That said, as discussed in the earlier opinion, the court's reading of the Ordinance suggests it could conceivably impair Plaintiffs' already-existing contracts with customers in the event that they modify their equipment while still under the contract term, or if the Fire Chief determines that an extension to an existing contract need not be granted to a customer beyond August 31, 2019.[9] (*See Alarm Detection*, 2017 WL 3780279 at *13.)

The court need not definitively determine the substantial impairment issue, given that Plaintiffs have not pleaded sufficient facts to surpass step two of the Contracts Clause analysis. Under this prong, the court asks whether Schaumburg's potential interference with Plaintiffs' contracts "[is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption." *Energy Reserves Grp.*, 459 U.S. at 412 (internal quotation marks and citation omitted). Under this step, "courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure." *Energy Reserves Grp.*, 459 U.S. at 413 (quoting *U.S. Tr. Co. of New York v. New Jersey*, 431 U.S. 1, 23 (1977)).

---

[8]     *See In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d 931, 938 (N.D. Ill. 2018) (St. Eve, J.) ("[A]lthough a 'complaint may not be amended by the briefs in opposition to a motion to dismiss' . . . courts may 'consider additional facts set forth in' a brief opposing dismissal 'so long as those facts are consistent with the pleadings.'") (citing *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 348 (7th Cir. 2012); *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019–20 (7th Cir. 2013)) (additional citations omitted).

[9]     The parties have cited no authority on the question of whether an impediment of contract renewal constitutes substantial impairment.

In this case, Plaintiffs have alleged that Schaumburg passed an ordinance that requires Commercial Accounts to start sending their fire alarm monitoring signals directly to NWCDS over the course of approximately three years, with an option to extend the time period further. Schaumburg did so after an Illinois court determined that municipalities have the authority to require commercial structures to directly connect to a village's fire board. *Hinsdale*, 326 Ill. App. 3d 372, 380, 761 N.E.2d 782, 789 (2001). *See also id.* at 786 (equating remote monitoring stations and municipal fire boards). The Village provides several justifications for their Ordinance, including public safety, reliability, "[e]liminat[ing] the possibility of signal transmission delays," and "[p]romoting faster response times by the fire department." (VC [1] Ex. H, at 101.) Plaintiffs question these justifications and assert that they can use technologies such as automatic retransmission to achieve the same goals. (Pls.' Response to Dfs.' MTD [92], at 11, 12.) But these assertions, construed in the light most favorable to Plaintiffs, do not establish that any impairment to Plaintiffs' contracts are unreasonable in light of the public purposes justifying the Ordinance. Thus, Plaintiffs' Contracts Clause claims are dismissed.

### C. Fourteenth Amendment Claims

Plaintiffs allege that the Defendants have committed both substantive due process and equal protection violations under the Fourteenth Amendment. For the reasons explained below, both claims fail against all Defendants.

#### 1. Substantive Due Process

Plaintiffs allege that "Defendants have interfered [with] and taken away Plaintiffs' [property] rights" to which they are entitled "under their licenses under the Alarm Act." (VC [1], ¶ 171.) Business licenses constitute property, and an ordinance limiting Plaintiffs' ability to operate under those licenses may constitute a due process violation. *See Alarm Detection Systems, Inc. v. Orland Fire Protection District*, 194 F. Supp. 3d 706, 724 (N.D. Ill. 2016) (quoting *Reed v. Village of Shorewood*, 704 F.2d 943, 949 (7th Cir.1983), *overruled on other grounds by Brunson v. Murray*, 843 F.3d 698, 713 (7th Cir. 2016)). To allege a viable substantive due process violation,

Plaintiffs must either allege the violation of a fundamental right or assert facts that show the challenged government conduct would not survive rational basis review. As the Seventh Circuit has explained:

> Substantive due process is not a blanket protection against unjustifiable interferences with property. . . . It is instead a modest limitation that prohibits government action only when it is random and irrational. Unless a governmental practice encroaches on a fundamental right, substantive due process requires only that the practice be rationally related to a legitimate governmental interest, or alternatively phrased, that the practice be neither arbitrary nor irrational.

*Frey Corp. v. City of Peoria, Ill.*, 735 F.3d 505, 508 (7th Cir. 2013) (footnote added).

Plaintiffs have not alleged the violation of a fundamental right. *See Albright v. Oliver*, 510 U.S. 266, 272, 114 S. Ct. 807, 812, 127 L. Ed. 2d 114 (1994) ("The protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity."); *Nat'l Paint & Coatings Ass'n v. City of Chicago*, 45 F.3d 1124, 1129 (7th Cir. 1995) ("Corporations do not have fundamental rights."); *Brown v. City of Lake Geneva*, 919 F.2d 1299, 1302 (7th Cir. 1990), ("[A] liquor license does not rise to the level of a fundamental right.").

Nor do Plaintiffs assert facts sufficient to raise a plausible inference that there is no rational basis for the Ordinance. The Ordinance states that "the Fire Chief has advised that the public safety would be best served to require a supervising station through Northwest Central due to our experience with alarms being out of service which endangers the health, safety and welfare of the general public."[10] (VC Ex. B, at 4.) Plaintiffs dispute this rationale, but that does not alter the legal analysis. *See Pro-Eco, Inc. v. Bd. of Comm'rs of Jay Cty., Ind.*, 57 F.3d 505, 514 (7th Cir. 1995) ("[G]overnmental action passes the rational basis test if a sound reason may be

---

[10] The September 27, 2016 notice sent to Fire Alarm Users in the Village provides further rationale for the ordinance. "In an effort to provide greater reliability of alarm systems and improve fire apartment response times, the Village of Schaumburg recently changed an ordinance." (VC [1], Ex. H.) The notice also states that the ordinance "will improve service through increased efficiency and accountability." (*Id.*)

hypothesized. The government need not prove the reason to a court's satisfaction.") (quoting *Northside Sanitary Landfill, Inc. v. City of Indianapolis*, 902 F.2d 521, 522 (7th Cir.1990)).

Plaintiffs, addressing their substantive due process and equal protection claims together, nevertheless urge the court to look beyond the Village's "purported safety justification." (Pls.' Resp. to Dfs.' MTD [92], at 9.) In support, they cite a portion of a footnote in *Weinberger v. Wiesenfeld*, 420 U.S. 636, 648 n.16 (1975) ("This Court need not in equal protection cases accept at face value assertions of legislative purposes."); *see Eby-Brown Co., LLC v. Wisconsin Dep't of Agric.*, 295 F.3d 749, 754 (7th Cir. 2002), *as amended on denial of reh'g* (Aug. 12, 2002) (equating the scrutiny the court exercises under the equal protection clause and the substantive due process clause). The balance of the *Weinberger* footnote defeats Plaintiffs' contention, however: the Court continued by saying that "[t]his Court need not in equal protection cases accept at face value assertions of legislative purposes, when an examination of the legislative scheme and its history demonstrates that the asserted purpose *could not have been* a goal of the legislation." *Weinberger*, 420 U.S. at 648 (emphasis added).

Plaintiffs make no allegations regarding the Ordinance's history or the events leading to its enactment. Their allegations that the Village makes "over $300,000 per year" in credits from NWCDS under the alleged "arrangement" (VC [1], ¶ 85) does not establish that safety could not have been a goal of the Ordinance. *See Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1071 (7th Cir. 2013) ("It is irrelevant whether the reasons given actually motivated the legislature; rather, the question is whether some rational basis exists upon which the legislature could have based the challenged law."). Nor does the fact that Schaumburg sent out a notice notifying alarm users of the Ordinance and of NWCDS' relationship with Tyco suggest that the Village's goal in passing the Ordinance could not have been safety.[11] (VC [1], Ex. H, at 100.)

---

[11] Plaintiffs cite *Kendall-Jackson Winery, Ltd. v. Branson*, 82 F. Supp. 2d 844, 875 (N.D. Ill. 2000), *appeal dismissed* 212 F.3d 995 (2000) for the proposition that "the court must consider whether the government is actually 'exercising its police power, rather than providing a benefit to special interests.'" (Pls.' Resp. to Dfs.' MTD [92], at 10.) That case lays out a standard

Plaintiffs also emphasize that they use "the same or functionally equivalent transmission equipment as Tyco" and that those "transmitters can send all Signals directly to NWCDS to meet the putative goal of the ordinance." (Pls.' Memo. in Response to Dfs.' MTD [92], at 10–11 (citing VC ¶¶ 18, 26, 47–48, 55, 57, 60–62).) Notably, however, the pleadings reveal that, prior to the passage of the Ordinance, plaintiffs were *not* sending signals directly to NWCDS. (VC [1] ¶ 12 ("Upon the receipt of a Signal from a Commercial Account in Schaumburg, a phone call would be made from the supervising station to NWCDS.").) The Plaintiffs cite no authority suggesting that the Village was required to consult with Plaintiffs about its planned operations and capabilities before proceeding with the Ordinance. Moreover, Plaintiffs' ability or willingness to change its operations does not create an inference that the Ordinance lacked a safety rationale. (*See Alarm Detection*, 2017 WL 3780279 at *16 ("[T]he fact that there are other ways to achieve the public

---

for review under the second prong of the Contracts Clause analysis, not for rational basis review. *See Kendall-Jackson Winery*, 82 F. Supp. at 875 ("The requirement of a legitimate public purpose guarantees that the State is exercising its police power, rather than providing a benefit to special interests.") (citing *Energy Reserves Grp.*, 459 U.S. at 412).

In any event, *Kendall-Jackson* is not helpful to Plaintiffs. In that case, the plaintiffs were wine and spirits suppliers who challenged an Illinois law as a violation of the Contracts and Dormant Commerce Clauses of the U.S. Constitution, not the Fourteenth Amendment. The challenged provision retroactively barred suppliers from terminating distribution agreements with distributors unless the suppliers were "acting in good faith" and "not in retaliation" for the distributors' exercising their "right to petition the General Assembly." *Kendall-Jackson*, 82 F. Supp. 2d at 848. The district court granted the suppliers a preliminary injunction and denied defendants' motions to dismiss, but the court's ruling deferred heavily to the state's proffered economic justifications for the law. These justifications included concerns over suppliers' bargaining power and protecting distributors who pay taxes and help control liquor sales. *Id.* at 875 ("Unquestionably, the state interests served by a strong local distributorship network are substantial, and a judgment by the Illinois legislature that that interest is best-served by prohibiting termination of distributorships except for good cause is beyond challenge. What is not adequately addressed . . . is how such an interest is served by [the law's] *retroactive* imposition of a limitation on termination rights. The court has strained to find some way in which the retroactive portion of this legislation advances the legislation's broader purposes.") (emphasis in original). The court even went so far as to posit it own "conceivabl[e]" purpose for the retroactive application of the law before determining that none of the justifications did "anything other than adjust the contractual obligations and remedies" of the parties. *Id.* at 876.

Here, the court need not strain; the Ordinance's justifications, such as public safety, system reliability, and eliminating transmission delays perceivably relate to the Village's reasons for regulating fire alarms and building permits. The Ordinance also imposes little retroactive burden on Plaintiffs' contracts. *Kendall-Jackson* is inapposite.

safety of the Ordinance does not mean that the Ordinance will not also achieve these goals.").) *See also Williamson v. Lee Optical of Oklahoma Inc.*, 348 U.S. 483, 487, 75 S. Ct. 461, 464, 99 L. Ed. 563 (1955) ("The [ ] law may exact a needless, wasteful requirement in many cases. But it is for the legislature, not the courts, to balance the advantages and disadvantages of the new requirement."); *Eby-Brown*, 295 F.3d at 754 ("Absent some antipathy directed at a particular group or an enactment that encumbers a fundamental right, improvident decisions by the political branches of government should be rectified through the democratic process and not the courts.").

Because Plaintiffs has not stated a claim that the Ordinance would not survive rational basis review, their Substantive Due Process claims (Count V Sub-Count A) are dismissed.

The court notes that, regardless of this rational basis analysis, Fourteenth Amendment claims necessarily fail against Tyco. Plaintiffs have not pleaded facts showing that Tyco is a state actor, as required for liability under the Fourteenth Amendment. (VC [1], ¶ 39 ("Defendant Tyco is a Delaware limited liability company.").) *See T.E. v. Grindle*, 599 F.3d 583, 589 (7th Cir. 2010) ("There are two types of substantive due process violations. The first occurs when the *state actor's* conduct is such that it 'shocks the conscience.'. . . The second occurs when the *state actor* violates an identified liberty or property interest protected by the Due Process Clause.") (emphasis added) (citing *Rochin v. California*, 342 U.S. 165, 172-73, 72 S.Ct. 205, 96 L.Ed. 183 (1952)); *Davis v. Union Nat. Bank*, 46 F.3d 24, 25 (7th Cir. 1994) ("Action by a private party pursuant to [§ 1983], without something more, [is] not sufficient to justify a characterization of that party as a 'state actor.'") (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939 (1981)).[12]

---

[12] Conversely, NWCDS is likely a state actor for purposes of the Fourteenth Amendment. (*See* NWCDS' Memo. in Support of MTD [54], at 2 ("NWCDS as a local governmental entity is entitled to statutory tort immunity.").) *See also Maltby v. Winston*, 36 F.3d 548, 551, 560 n.14 (7th Cir. 1994) (allowing Fourth Amendment claims to proceed under § 1983 against a law enforcement task force formed pursuant to the Intergovernmental Cooperation Act, 5 ILCS 220/1—the same act under which NWCDS is formed). *Cf. Hood v. Illinois High Sch. Ass'n*, 359 Ill. App. 3d 1065, 1069, 835 N.E.2d 938, 941 (2nd Dist. 2005) (finding that the Illinois High School Association was not a local public entity for purposes of the Illinois' Tort Immunity Act 745 ILCS 10/1-101 *et seq.* even though that organization had been found to be a state actor "for the

### 2.  Equal Protection

Plaintiffs allege Defendants violated the Fourteenth Amendment's Equal Protection Clause.  The Equal Protection Clause, U.S. Const. Amdt. 14, § 1, states that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  "In considering whether state legislation violates the Equal Protection Clause of the Fourteenth Amendment, . . . we apply different levels of scrutiny to different types of classifications. At a minimum, a statutory classification must be rationally related to a legitimate governmental purpose." *Clark v. Jeter*, 486 U.S. 456, 461 (1988) (citation omitted).  "Classifications based on race or national origin . . . and classifications affecting fundamental rights . . . are given the most exacting scrutiny.  Between these extremes of rational basis review and strict scrutiny lies a level of intermediate scrutiny, which generally has been applied to discriminatory classifications based on sex or illegitimacy." *Id.*  Plaintiffs have not alleged discrimination based on membership in a protected class, or the violation of a fundamental right.  Therefore, to allege a viable equal protection claim, they must plausibly allege "'that [they] ha[ve] been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" *D.B. ex rel. Kurtis B. v. Kopp*, 725 F.3d 681, 685 (7th Cir. 2013) (citing *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam)).  "Stated differently, . . . the Equal Protection Clause protect[s] individuals against purely arbitrary government classifications, even when a classification consists of singling out just one person for different treatment for arbitrary and irrational purposes." *Kopp*, 725 F.3d at 685 (internal quotation marks and citation omitted).

---

purposes of § 1983" in *Griffin High School v. Illinois High School Ass'n*, 822 F.2d 671, 674 (7th Cir. 1987)).

Because the court dismisses Plaintiffs' substantive due process claim on this basis, it declines to address Defendants' argument that Plaintiff has not alleged the inadequacy of state law remedies or that there has been a constitutional violation independent of the due process clause. *See Lee v. City of Chicago*, 330 F.3d 456, 467 (7th Cir. 2003) ("[W]hen a substantive-due-process challenge involves only the deprivation of a property interest, a plaintiff must show 'either the inadequacy of state law remedies or an independent constitutional violation' before the court will even engage in this deferential rational-basis review.'") (citation omitted).

For the reasons discussed earlier, Plaintiffs' allegations are insufficient to establish that Defendants' actions were purely arbitrary. *See Kopp*, 725 F.3d at 686 ("[T]o get past a Rule 12(b)(6) motion to dismiss on a class of one equal protection claim, a plaintiff must allege facts sufficient to overcome the presumption of rationality that applies to government classifications.") (internal quotation marks and citation omitted); *Fares Pawn, LLC v. Indiana Dep't of Fin. Institutions*, 755 F.3d 839, 845 (7th Cir. 2014) ("[A] given action can have a rational basis and be a perfectly logical action for a government entity to take even if there are facts casting it as one taken out of animosity. . . . If we can come up with a rational basis for the challenged action, that will be the end of the matter—animus or no.") (internal quotation marks and citation omitted). Plaintiffs' Equal Protection Fourteenth Amendment claims (Count V Sub-Count B) are dismissed.

### D. Sherman Act Claims for Restraint of Trade and Monopolization Dismissed

Plaintiffs allege that Defendants "have combined, conspired and contracted, through the anticompetitive means described herein, to unreasonably restrain trade and commerce among the several states and to suppress and prevent competition in Schaumburg in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1." (VC [1] ¶ 124.) They further allege that Defendants'

> anticompetitive conduct, agreements, schemes, acts and practices constitute a conspiracy to intentionally and unlawfully monopolize, or attempt to monopolize, interstate trade and commerce in the Schaumburg Market, and the intentional and unlawful maintenance and use of monopoly power in the Schaumburg Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2."

(VC [1] ¶ 137.) Defendants NWCDS and Village both argue that the state action immunity doctrine shield them from liability for these alleged acts. As discussed in its prior Order [65], this court finds it likely that the state action immunity doctrine prohibits antitrust liability against the Village. (Order [65], at 19–23.) The court declines to decide that issue here, however, because Plaintiffs' allegations are insufficient to state a claim under the Sherman Act against any of the Defendants.

### 1. Section 1 Restraint of Trade

Section 1 of the Sherman Act declares "[e]very contract, combination . . . or conspiracy, in restraint of trade or commerce . . . to be illegal." 15 U.S.C. § 1.  To survive a motion to dismiss under § 1, a plaintiff must plead facts sufficient demonstrate the existence of: "(1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in [a] relevant market; and (3) an accompanying injury." *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012) (quoting *Denny's Marina, Inc. v. Renfro Prods.*, Inc., 8 F.3d 1217, 1220 (7th Cir.1993)). Plaintiffs must plead "enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556; *see id.* at 554 (explaining that " 'the [c]rucial question' is whether the challenged anticompetitive conduct 'stem[s] from independent decision or from an agreement, tacit or express' ") (modifications in original) (quoting *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540 (1954)).  *See also MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*, 62 F.3d 967, 972 (7th Cir. 1995) ("A party may independently decide with whom it will deal, and it may, without running afoul of section 1, decide to direct all of its business to a single supplier").

Here, Plaintiffs have failed to plead facts sufficient to lead to a plausible inference of illegal agreement among Defendants.  Plaintiffs do not argue that the 2011 agreement between Tyco and NWCDS was illegal.[13]  (Pls.' Response to Dfs.' MTD [92], at 8 ("The Alarm Companies are not challenging an exclusive contract on its own terms—they are challenging the combined anticompetitive effect of the Exclusive Agreement, ordinance, and Village enforcement actions.").)  Therefore, Plaintiffs must plead facts raising a plausible inference of agreement between the Village and the other two Defendants.  Plaintiffs rely heavily on the argument that the "Village was fully aware of the Exclusive Agreement before passing the Ordinance." (*Id.* at 4.)  To substantiate

---

[13]      Plaintiffs argue that the court must "consider[] the 'practical effect' of the Agreement and Ordinance operating together" rather than "asses[ing] the Agreement and Ordinance in isolation." [92], at 4 (citing *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 326 (1961)).  *Tampa Electric*'s discussion of "practical effects" comes in the context of Clayton Act § 3 tying claims, which Plaintiffs have not alleged in their Complaint.  Further, as the court does not rely here on the state action immunity doctrine, this argument is irrelevant.

this argument, Plaintiffs point to Paragraphs 72 and 73 of their Verified Complaint, which simply note the existence and contents of September 27, 2016 Notice. (VC [1] ¶ 72, 73, Ex. H.) But the Ordinance was passed on August 23, 2016—more than a month before the Notice was sent. (VC [1], Ex. B at 3; Ex H.) Plaintiffs argue that this timing "cannot negate [their] conspiracy allegations." (Pls.' Response to Dfs.' MTD [92], at 5 (citing *In Re Plasma*, F. Supp. 2d 991, 1000 (N.D. Ill. 2011) ("[I]nterdependence *can* be inferred from parallel conduct that is sequential rather than simultaneous.") (emphasis added).) Though that may true in some circumstances, the Village's notice to Fire Alarm users of the practical effect of the Ordinance does not establish that the Ordinance itself is the product of a conspiracy.

Plaintiffs further summarily argue that "the Village intended that the Ordinance as implemented [ ] eliminate the central station option" for fire alarm monitoring. ([92], at 4.) Again, the portions of the complaint that Plaintiffs point to for support (VC [1], at ¶¶ 15, 66, 72–73, Ex. C §§ 3.1, 4.3) fail to raise any plausible inference of such intent or of any agreement among Defendants "above the speculative level." *Twombly*, 550 U.S. at 555.

Finally, Plaintiffs urge that agreement can be inferred from the fact that "[t]he financial benefits received by the Defendants are interdependent." (Pls.' Resp. to Dfs.' MTD [92], at 4.) Specifically, the court assumes the truth of Plaintiffs' allegations that "Tyco [charges] a supracompetitive price of $81 per month . . . Tyco gives a portion of these proceeds to NWCDS . . . [and] NWCDS applies these proceeds as a credit to off-set the Village's dispatch fees." (*Id.*, at 4 (citing VC [1] ¶¶ 81–85).) This assertion comes closest to raising an inference of agreement among the parties, but is not sufficient, in court's view, to raise an inference of agreement beyond speculation: Tyco agreed to pay NWCDS in $23 per end-user in the parties' 2011 agreement, well before the Schaumburg Ordinance was passed. (VC [1] Ex. C § 7.1.) There is no basis for an inference that Schaumburg had any influence or involvement in that 2011 agreement, and nothing in the record suggests that Tyco intended that money (or its benefit) be passed along to a third party. *See Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 189–90 (2010) (citing

15 U.S.C. § 1) ("Not every instance of cooperation between two people is a potential 'contract, combination ..., or conspiracy, in restraint of trade.'") (modification in original)).

Then, in 2016, Schaumburg passed its ordinance, under which it allegedly profits in the form of credit from NWCDS. The text of the Ordinance contains nothing about the credit, and plaintiffs plead no additional facts to suggest there may have been an illegal agreement to profit between Schaumburg and NWCDS or Tyco. *See In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 789 (N.D. Ill. 2017) ("[T]he circumstances of the case must reveal a unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement.") (citing *Omnicare, Inc. v. UnitedHealth Group*, Inc., 629 F.3d 697, 706 (7th Cir. 2011)).[14] Therefore, without more information about how the alleged agreement came about or operated, the court cannot infer the plausibility of an agreement to restrain trade from this fact alone.

Because Plaintiffs fail to allege facts that "state a claim to relief that is plausible on its face" under Sherman Act § 1, those allegations are dismissed. *Limestone Dev. Corp. v. Vill. of Lemont*, 520 F.3d 797, 803 (7th Cir. 2008).[15]

### 2. Section 2 Monopolization

Section 2 of the Sherman Act addresses monopolization, "forbid[ding] not the intentional pursuit of monopoly power but the employment of unjustifiable means to gain that power." *State of Illinois ex rel. Burris v. Panhandle Eastern Pipe Line Co.*, 935 F.2d 1469, 1481 (7th Cir.1991). To state a claim for monopolization, Plaintiffs must "show '(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or

---

[14]     Plaintiffs argue that both Tyco and NWCDS have "acquiesce[ed]" in an "illegal scheme." (Pls. Resp. to Dfs.' MTD [92], at 5.) This does not save their § 1 argument, given that it is precisely such an illegal scheme that Plaintiffs fail to sufficiently plead.

[15]     Thus, the court does not reach NWCDS' argument that Plaintiffs failed to allege an antitrust injury. (NWCDS' Memo. in Support of MTD [54], at 11.)

historic accident.' " *Elliott v. United Ctr.*, 126 F.3d 1003, 1004–05 (7th Cir. 1997) (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966)). Plaintiffs have not presented facts that suggest that Tyco or NWCDS had any influence over the passage of the Ordinance and therefore fail to allege any willful acquisition of monopoly power.[16]

A claim for attempted monopolization, on the other hand, requires Plaintiffs to "show (1) the [Defendants'] specific intent to achieve monopoly power in a relevant market; (2) predatory or anticompetitive conduct directed to accomplishing this purpose; and (3) a dangerous probability that the attempt at monopolization will succeed." *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 854 (7th Cir. 2011) (citing *Lektro–Vend Corp. v. The Vendo Co.*, 660 F.2d 255, 270 (7th Cir.1981)). Plaintiffs allege that "Tyco and NWCDS have acted with the specific intent to monopolize the Schaumburg Market," (VC [1], at ¶ 138), but the Schaumburg notice, and Defendants' monetary benefit do not by themselves "establish a nonnegligible probability" that Tyco or NWCDS influenced the passage of the Ordinance.[17] *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 629 (7th Cir. 2010). As such, the Plaintiffs' Sherman Act § 2 claims are dismissed against all Defendants.

### E.    Clayton Act Claim

Plaintiffs' final antitrust claim alleges that Defendants have violated § 7 of the Clayton Act. 15 U.S.C. § 18. "Section 7 of the Clayton Act makes it unlawful to 'acquire . . . the assets of another person . . . where in any line of commerce . . . in any section of the country, the effect of such acquisition may be substantially to lessen competition.'" *Fed. Trade Comm'n v. Advocate*

---

[16]    Plaintiffs assert that they "sufficiently pled that Defendants had a 'specific intent' to monopolize" on the "same allegations" as those discussed above with respect to § 1. [92], at 5. Just as the assertions failed there, they fail here. The court further notes, as above, that Plaintiffs do not challenge the legality of the Tyco-NWCDS Agreement itself.

[17]    Plaintiffs' § 2 claim fails on these grounds alone; as noted earlier, *Alarm Detection*, 2017 WL 3780279, *12 n 24, however, any alleged attempt by Tyco or NWCDS to influence the passage of the Ordinance would not be sufficient to establish Sherman Act liability. *See E. R. R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 135 (1961).

*Health Care Network*, 841 F.3d 460, 467 (7th Cir. 2016).  Defendants only broadly challenge Plaintiffs' claim under the Clayton Act (NWCDS Memo. in Support of MTD [54], at 9; Schaumburg Memo. in Support of MTD [56], at 6), and Plaintiffs, for their part, have not addressed their Clayton Act claim in their response brief [92].  Thus, the court relies solely on the Verified Complaint, which says nothing more than that "NWCDS' and Tyco's acquisition of the exclusive right to provide the Business in the Schaumburg market constitutes an asset acquisition within the meaning of Section 7."  (VC [1], at 30.)  A "formulaic recitation of the elements of a cause of action" is not sufficient.  *Twombly*, 550 U.S. 555.  Plaintiffs fail to state a claim for a Clayton Act § 7 violation.

### F.    Tort Claims

"When all federal claims in a suit in federal court are dismissed before trial, the presumption is that the court will relinquish federal jurisdiction over any supplemental state-law claims . . . , which the plaintiff can then prosecute in state court."  *Al's Serv. Ctr. v. BP Prod. No. Am, Inc.*, 599 F.3d 720, 727 (7th Cir. 2010).  If "it is absolutely clear how the pendent claims can be decided," this presumption may be displaced.  *RWJ Mgmt. Co. v. BP Prod. N. Am., Inc.*, 672 F.3d 476, 480 (7th Cir. 2012).  It is absolutely clear that some of Plaintiffs' tort allegations should be dismissed, while others require more detailed analysis.  For the reasons set out below, this court dismisses Plaintiffs' tort claims in part and relinquishes jurisdiction in part.

### 1.    Tort Immunity Act Bars Liability for Damages

First, Defendant Schaumburg asserts that the Illinois Tort Immunity Act (TIA) renders them "not liable for any injury caused by adopting or failing to adopt an enactment or by failing to enforce any law."  (Schaumburg Memo. in Support of MTD [56], at 9 (citing 745 ILCS 10/2-103).)  NWCDS similarly asserts immunity under the TIA.  (NWCDS Memo. in Support of MTD [54], at 16 (citing 745 ILCS 10/2-101 *et seq.*))  The TIA applies to "local public entit[es]," 745 ILCS 10/2-101.  Both municipal corporations and entities formed under the Illinois Intergovernmental Cooperation Act are local public entities.  745 ILCS 10/1-206.  Therefore, the TIA applies to both NWCDS, which

was formed under the Intergovernmental Cooperation Act (VC [1], ¶ 40), and Schaumburg, which is a municipal corporation. (*Id.* at ¶ 38.)

Plaintiffs accept both parties' immunity with respect to damages. They simply argue in their response brief that the TIA does not bar *injunctive* relief. (Pls. Response to Dfs.' MTD [92], at 18 (citing 745 ILCS 10/2-101; *Am. Islamic Ctr. v. City of Des Plaines*, 32 F. Supp. 3d 910, 915-16 (N.D. Ill. 2014)).) Therefore, Plaintiffs' tort claims are dismissed to the extent that they seek damages against Schaumburg and NWCDS.

## 2. Tortious Interference

In order to state a claim of tortious interference with contract, plaintiffs must allege facts demonstrating: "(1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of this contractual relation; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by the defendant's wrongful conduct; and (5) damages." *Melrose Commons LLC v. Selective Imports, Inc.*, 2016 IL App (1st) 143110-U, ¶ 72 (citation omitted). The "[i]nducement to breach a contract involves acts aimed at parties other than a plaintiff" and "must cause those parties to breach a contract held by that plaintiff." *Israel v. Nat'l Canada Corp.*, 276 Ill. App. 3d 454, 464, 658 N.E.2d 1184, 1193 (1st Dist.1995).

Similarly, "[t]he tort of interference with prospective economic advantage has four elements: (1) plaintiff must have a reasonable expectancy of a valid business relationship; (2) defendant must know about it; (3) defendant must intentionally interfere with the expectancy, and so prevent it from ripening into a valid business relationship; and (4) intentional interference must injure the plaintiff." *Schuler v. Abbott Labs.*, 265 Ill. App. 3d 991, 994, 639 N.E.2d 144, 147 (1st Dist. 1993) (citation omitted).

Plaintiffs have failed to allege any behaviors by Tyco that could, under either theory, constitute intentional inducements of third-parties to breach contracts with Plaintiffs. Plaintiffs allege that "Tyco is soliciting and entering into contracts with Alarm Companies' customers" (VC

[1], at 16 (citing ¶¶ 22–25, 69–79, and Exs. B, H–J), and that Tyco has "unlawfully poached" Plaintiffs' customers.  (VC [1], ¶¶ 65–66, 69–79.)  These paragraphs of the Complaint provide no factual support for such allegations.  Therefore, the tortious interference with contract claim is dismissed with respect to Tyco.

With respect to Defendants NWCDS and Schaumburg, Plaintiffs and Defendants dispute whether Plaintiffs have sufficient well-pleaded facts to establish each element of both torts. Specific areas of dispute include Defendants' knowledge of Plaintiffs' existing contracts with Commercial Accounts; whether Defendants' conduct was directed toward any third party; whether Plaintiffs have a legitimate business expectancy; and whether Defendants' actions caused third-parties to decline to enter into business with Plaintiffs.  (NWCDS' Memo. in Support of MTD [54], 14–15; Schaumburg's Memo. in Support of MTD [56], at 10–11; Pls.' Resp. to Dfs.' MTD [92], at 15.)  Because these issues are less than "absolutely clear," this court relinquishes its jurisdiction over Plaintiffs' tortious interference claims for injunctive relief against NWCDS and the Village. *RWJ Mgmt.*, 672 F.3d at 480.

### G.    Unjust Enrichment

Defendants argue, and Plaintiffs concede, that Plaintiffs' "unjust enrichment claim depends on their ultimate success in proving one of their other claims."  (Pls.' Resp. to Dfs.' MTD [92], at 16.)  As all claims, except for those for injunctive relief from tortious interference, have been dismissed by this court, Plaintiffs' claim for unjust enrichment is similarly dismissed.  As that claim relates to the claims over which this court has relinquished jurisdiction, it relinquishes jurisdiction over the unjust enrichment claim as well.

### H.    Statutes of Limitations

Antitrust actions are subject to a four-year statute of limitations.  *See In re Copper Antitrust Litig.*, 436 F.3d 782, 786 (7th Cir. 2006) (citing 15 U.S.C. § 15(b)).  "Generally, an antitrust 'cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business.' "  *In re Copper Antitrust Litig.*, 436 F.3d 782, 789 (7th Cir. 2006) (citing *Zenith*

*Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971)).  This statute of limitations is subject to the discovery rule: "accrual occurs when the plaintiff discovers that he has been injured and who caused the injury."  *In re Copper Antitrust Litig.*, 436 F.3d at 789 (internal quotation marks and citations omitted).  Thus, "[t]he period of limitations for antitrust litigation runs from the most recent injury caused by the defendants' activities rather than from the violation's inception."  *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 902 (7th Cir. 2004) ("Each discrete act with fresh adverse consequences starts its own period of limitations.").

Defendants argue that any challenge by Plaintiff regarding the lawfulness of the Tyco-NWCDS Monitoring Center Agreement is time-barred.  But Plaintiffs have made it clear that they are *not* challenging that agreement.  Instead, they challenge the "totality" of the effect of the August 2016 Ordinance as it "operat[es] together" with the Agreement.  (Pls.' Response to Dfs.' MTD [92], at 4.)  Thus, their alleged injury only occurred then, and Plaintiffs filed their complaint approximately seven months later.

The Seventh Circuit has noted that "[o]nly when the plaintiff pleads itself out of court—that is, admits all the ingredients of an impenetrable defense—may a complaint that otherwise states a claim be dismissed under Rule 12(b)(6)."  *Xechem*, 372 F.3d at 901 ("[P]laintiffs need not anticipate and attempt to plead around all potential defenses. Complaints need not contain any information about defenses and may not be dismissed for that omission.").  Because Plaintiff filed its Complaint within the statutory period, and because Plaintiffs allege that the passage of the Ordinance is what triggered their injury, no statute of limitations defense bars Plaintiffs antitrust claims as they are now pleaded.

Defendants additionally note that Fourteenth Amendment Claims have a two-year statute of limitations.  *Ashafa v. City of Chicago*, 146 F.3d 459, 462 (7th Cir. 1998).[18]  For the same

_____

[18]    The text of 42 U.S. § 1983 contains no statute of limitations. Thus, the district court must look to the state's statute of limitations for a given claim. "This circuit has consistently held that the appropriate statute of limitations for § 1983 cases filed in Illinois is two years as set forth in 735 ILCS § 5/13–202."  *Ashafa v. City of Chicago*, 146 F.3d 459, 461 (7th Cir. 1998).

reasons given above, these statutes of limitations do not bar Plaintiffs' claims at this stage in the pleadings.

### I.      Laches

Finally, Defendants argue that the doctrine of laches bars Plaintiffs' claims.  (*See* NWCDS Memo. in Support of MTD [54], at 20; Defendant Tyco's Reply in Support of its Motion to Dismiss Plaintiffs' Verified Complaint [95], at 13.)  "For laches to apply . . . the party asserting the defense must demonstrate: (1) an unreasonable lack of diligence by the party against whom the defense is asserted and (2) prejudice arising therefrom."  *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 820 (7th Cir. 1999).  Defendants' laches argument suffers from the same defect as their statute of limitations defense: they argue that the doctrine bars Plaintiffs' challenge to the Tyco-NWCDS Agreement, but that Agreement's validity is not challenged by Plaintiffs.  Defendants argue no unreasonable lack of diligence by Plaintiffs. Therefore, laches provides no bar to Plaintiffs' claims as currently pleaded.

### CONCLUSION

Plaintiffs motion for reconsideration of the court's Order denying Plaintiffs' motion for a preliminary injunction [68] is denied.  Defendant Tyco's motion to dismiss [84] is granted. Defendants NWCDS and Schaumburg's motions to dismiss [79, 81] are granted in part, and the court relinquishes jurisdiction over Plaintiffs' state law claims for injunctive relief.

ENTER:

Dated: September 28, 2018

_____
REBECCA R. PALLMEYER
United States District Judge