UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ALARM DETECTION SYSTEMS, INC., an Illinois corporation, ILLINOIS ALARM SERVICE, INC., an Illinois corporation, NITECH FIRE & SECURITY INDUSTRIES, INC., an Illinois corporation, and SMG SECURITY SYSTEMS, INC., an Illinois corporation,<br><br>    Plaintiffs,<br><br>    v.<br><br>THE VILLAGE OF SCHAUMBURG, a Municipal corporation, Corporation,<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  No.  17 C 2153<br>)<br>)  Judge Rebecca R. Pallmeyer<br>)<br>)<br>)<br>)<br>)<br>) |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs are companies that provide fire alarm monitoring services to commercial and multi-family buildings in the Village of Schaumburg. This lawsuit concerns a local ordinance regarding fire alarm signal processing. Initially, Plaintiffs alleged that Defendant Village of Schaumburg—influenced by the local 911 dispatch center and one of Plaintiffs' competitors, Tyco Integrated Security LLC—passed the ordinance to exclude Plaintiffs from the market for fire alarm monitoring services and reap monopoly profits. Proceeding under 42 U.S.C. § 1983, Plaintiffs asserted claims for violations of the Contracts Clause of Article I and the Equal Protection and Due Process Clauses of the Fourteenth Amendment. They also asserted claims for violations of the Sherman Act, 15 U.S.C. §§ 1, 2, the Clayton Act, 15 U.S.C. § 18, and Illinois tort laws.[1] In August 2017, the court denied Plaintiffs' motion for a preliminary injunction against enforcement of the ordinance. The court later denied Plaintiffs' motion for reconsideration. In the same order, it, granted Defendants' Rule 12(b)(6) motion to dismiss the claims arising under federal law,

---

[1] Plaintiffs originally named not only Schaumburg, but also Tyco and the local 911 dispatcher—Northwest Central Dispatch System ("NWCDS")—as Defendants. As explained herein, Tyco and NWCDS have been dismissed from the case.

dismissed the state-law tort claims against Tyco, and relinquished jurisdiction over the state-law tort claims against Schaumburg and NWCDS. The Court of Appeals for the Seventh reversed the dismissal of the Contracts Clause claim against the Village of Schaumburg and remanded the case for litigation of that claim. *See Alarm Detection Sys., Inc. v. Vill. of Schaumburg*, 930 F.3d 812, 829 (7th Cir. 2019). It affirmed the dismissal of the other claims under Rule 12(b)(6) and thus declined to consider whether the court erred in denying Plaintiffs' request for a preliminary injunction. *See id.*

Now before the court is Schaumburg's Rule 12(b)(6) motion to dismiss Plaintiffs' Amended Verified Complaint, in which Plaintiffs assert claims against Schaumburg for violations of the Contracts Clause, tortious interference with contract, tortious interference with prospective economic advantage, and restitution (unjust enrichment). As explained here, the court denies Schaumburg's motion to dismiss all claims with one exception: Plaintiffs' claim for restitution is dismissed without prejudice.

## BACKGROUND

The court recounts the following facts from Plaintiffs' Amended Verified Complaint ("Am. VC") [122].

**A.    Plaintiffs' Business**

Plaintiffs are Alarm Detection Systems, Inc., Illinois Alarm Service, Inc., Nitech Fire & Security Industries, Inc., and SMG Security Systems, Inc. (Am. VC ¶¶ 10-13.) Each is a licensed private alarm contractor as defined in the Private Detective, Private Alarm, Private Security, Fingerprint Vendor, and Locksmith Act of 2004, 225 ILCS 447/5-5 *et seq*. (*Id.*) Each is in the business of installing, maintaining, testing, and monitoring fire alarm systems for commercial and multi-family buildings in Schaumburg. (*See id.* ¶¶ 1, 2, 4.) Plaintiffs refer to commercial and multi-family buildings as "Commercial Accounts." (*Id.* ¶ 2.)

In August 2016, there were allegedly more than 1,100 Commercial Accounts in Schaumburg. (*Id.* ¶ 41.) Plaintiffs had contracts with more than 250 of those accounts. (*Id.*) According to Plaintiffs, they "generally us[e] long term contracts that automatically renew." (*Id.* ¶ 4.) As parties to these long-term contracts, Plaintiffs allegedly enjoyed "near permanent relationships" with many of their Commercial Accounts, "who rely on a continued level of service to meet their needs." (*Id.* ¶ 27.) "Even when there is a change in ownership or management of a building," Plaintiffs allege, they "typically retain" the customers' business. (*Id.* ¶ 28; *see also id.* ¶ 27 (alleging that Plaintiffs often serve Commercial Accounts "for decades"); *id.* ¶ 29 (alleging that some of Plaintiffs' relationships with Commercial Accounts date back to the 1980s).)

**B.    The Exclusive Agreement, the Ordinance, and the Notice**

Schaumburg's fire code requires Commercial Accounts to use fire alarm systems that comply with the National Fire and Signaling Code ("NFPA 72"), a nationwide safety standard. (*Id.* ¶ 2.) Private alarm system companies, such as Plaintiffs, typically provide and maintain the required systems for the Commercial Accounts they service. (*See id.* ¶¶ 4, 24.) Fire alarm systems generally have three components: "smoke and heat detectors; an alarm panel in the building that receives signals from those detectors; and a transmission device to send all signals to a monitoring facility." (*Id.* ¶ 26.) "Under NFPA 72, signals from a fire alarm system" must "be sent to a receiving point" (also called a "Supervising Station"). (*Id.* ¶ 3.)[2] Private alarm system companies often operate Supervising Stations. (*Id.*) When a privately-operated Supervising Station receives an alarm signal, the private alarm company "contacts the appropriate 911 center or fire department," which in turn dispatches firefighters. (*Id.*; *see also id.* ¶ 18.) A government-operated local 911 center is another type of Supervising Station. (*See, e.g.*, *id.* ¶ 4; *Alarm Detection Sys.*, 930 F.3d at 819 (explaining that NWCDS, which operates the local 911 center for Schaumburg, is an "intergovernmental cooperation" (internal quotation marks omitted)).) NFPA

---

[2]    The court assumes that the term "monitoring facility" in Paragraph 26 of the Amended Verified Complaint is another name for a receiving point/Supervising Station.

72 permits fire alarm systems to send signals directly to local 911 centers using approved wireless transmission devices.  (*See, e.g.*, Am. VC ¶ 37.)  Before Schaumburg enacted the ordinance at issue in this lawsuit, some fire alarm systems transmitted signals directly to the local 911 center (NWCDS), while others used the two-step method that transmitted signals through privately operated Supervising Stations, which then contacted NWCDS upon receiving the signals.  (*See, e.g.*, *id.* ¶ 31; July 25, 2016 Fire Chief Memorandum, Ex. K to Am. VC [122-1] at PageID #:1291-93.)  Plaintiffs use the two-step method in providing services to more than "150 jurisdictions in Northern Illinois."  (Am. VC ¶¶ 24-25.)

In 2011, NWCDS and Tyco entered into a 10-year Exclusive Agreement under which Tyco provided NWCDS with fire alarm signal-receiving equipment.  (*See* NWCDS-Tyco Contract, Ex. M to Am. VC [122-1] §§ 2, 3.1 (PageID #:1297-98).)[3]  The Agreement gives Tyco "the exclusive right to install, own, maintain and service all alarm signal receiving and processing equipment and systems located at the NWCDS Operations Center and the covered agencies."  (*Id.* § 3.1 (PageID #:1298).)[4]  The "exclusive right pertains only to [Tyco's] receiving and processing systems . . . ."  (*Id.* § 3.1 (PageID #:1298).)  That is, the Agreement "does not provide any right to [Tyco] to require NWCDS, Covered Agencies, or End-Users to utilize [Tyco] services or equipment in individual premises to generate alarms that [Tyco's] receiving and processing systems receive and rout [sic] to NWCDS . . . ."  (*Id.*)  Under the Agreement, Tyco pays a $23 monthly administrative fee to NWCDS for each Commercial Account that connects to equipment at NWCDS via "Internet and cellular telephone-radio connections."  (*See id.* § 7.1 (PageID #:1302); Am. VC ¶ 75.)[5]

---

[3]  At the time, Tyco was called ADT Security Services, Inc.  (*See id.* at PageID #:1296.)

[4]  "Covered agencies" are public agencies that operate police and/or fire departments, including Schaumburg.  (*See id.* at PageID #:1296-97, 1311.)

[5]  The court notes that Section 7.1 of the Agreement does not state that the administrative fee is owed monthly.  It provides for "an" administrative fee.  (NWCDS-Tyco Contract § 7.1.)  But because both sides refer to the fee as a monthly fee, the court will assume for present purposes that their characterization is correct.  The court also notes that under the Agreement, Tyco pays NWCDS a $28—rather than $23—administrative fee for Commercial Accounts that use "hard-wired telephone or digital communicator connections." (*Id.*)  Neither side

In August 2016, Schaumburg enacted the challenged ordinance (hereinafter, the "Ordinance"). (*See* Am. VC ¶ 4.) The Ordinance requires all Commercial Accounts within the Village of Schaumburg to wirelessly transmit fire alarm signals directly to NWCDS. (*Id.* ¶ 4; *see* Ordinance No. 16-078, Ex. H to Am. VC [122-1] at PageID #:1270.) Under the Ordinance, "[a]ll existing" fire alarm systems must begin complying "when any of the following occurs": (1) "an existing contract with a monitoring agency (central station) ends"; (2) "the existing fire alarm equipment is modified or replaced"; or (3) "[p]rior to August 31, 2019." (Ordinance No. 16-078 at PageID #:1270.) The Ordinance carves out one exception. It provides that "[e]xtensions may be granted . . . upon a determination by the Fire Chief that the public safety is not affected . . . ." (*Id.*) No extension will be granted beyond 2021, however. (*Id.*)[6]

Schaumburg allegedly "justified the Ordinance by claiming it was not receiving timely notification regarding trouble and supervisory signals." (Am. VC ¶ 5 (explaining that trouble signals indicate whether an alarm system is performing properly, whereas supervisory signals indicate whether a system is in service).) But Schaumburg's "true motivation" for enacting the Ordinance, Plaintiffs allege, was a credit it would receive against fees it owed to NWCDS for 911 monitoring services. (*Id.* ¶¶ 8, 38.) Both sides appear to assume that the Exclusive Agreement between NWCDS and Tyco is the source of that credit. (*See id.* ¶ 75; Def.'s Mot. to Dismiss ("Def.'s Mot.") [127] at 3.) The court is uncertain of the basis for that assumption. The Exclusive Agreement provides for a $23 per account administrative fee payable to NWCDS, but makes no reference to a credit payable to Schaumburg. The only reference to a credit running in favor of Schaumburg that the court has located appears in the July 25, 2016 memorandum from Schaumburg's Fire Chief to Schaumburg's Village Manager. (*See* Fire Chief Memorandum at

---

mentions the $28 administrative fee, so the court disregards it. Nor has either party in this case explained how the $23 per month fee is calculated, or identified the service[s] provided by NWDCS in return for it, if any.

[6] Schaumburg "readopted" the "same requirements" in an ordinance dated January 23, 2018 ("Ordinance No. 18-011"). (Am. VC ¶ 37 n.2.) The parties do not differentiate between the August 2016 and January 2018 ordinances, so the court discusses only the former.

PageID #:1290.)  In that memorandum, the Fire Chief recommends adopting a direct-connect ordinance along the lines of the one Schaumburg eventually enacted.  (*See id.* at PageID #:1291.)  Discussing the benefits of such an ordinance, the Fire Chief states:

> The Village of Schaumburg would receive a portion of the subscriber fees that are paid.  This amounts to $23/alarm/month.  This revenue is applied as an off-set to service fees paid by the Village to NWCD for 911 services.  A conservative estimate is approximately $300,000–$400,000 in revenue will be realized for the Village of Schaumburg.

(*Id.* at PageID #:1292; *see also* Am. VC ¶ 75 (alleging that when all Commercial Accounts are complying with the Ordinance, Schaumburg will receive $300,000 to $400,000 per year in fee reductions).)

In a September 27, 2016 letter from the Fire Chief (the "Notice"), Schaumburg notified Commercial Accounts of the adoption of the Ordinance, explaining the safety reasons for its adoption and identifying the three events that trigger Commercial Accounts' compliance obligations.  (*See* Am. VC ¶ 40; Notice, Ex. J to Am. VC [122-1] at PageID #:1288-89.)  The Notice also states that Tyco "is the authorized installer of the radio equipment required for fire alarm systems monitored by NWCDS."  (Notice at PageID #:1288.)  According to the Notice, Commercial Accounts must pay $81 per month to rent Tyco's equipment and for the monitoring service.  (*Id.* at PageID #:1289.)  For Commercial Accounts that "own their radio transmitter," the Notice states, the fee for "alarm monitoring only" is $46.  (*Id.*)

Plaintiffs identify the "Challenged Conduct" in this lawsuit as "[t]he Ordinance as implemented by the Notice."  (Am. VC ¶ 6.)  "By [the Notice] to all Commercial Accounts," Plaintiffs allege, Schaumburg "required them to terminate their" contracts with Plaintiffs and contract instead with Tyco for fire alarm monitoring services.  (*Id.* ¶ 4; *see also id.* ¶ 6 ("[T]o comply with the Notice," Plaintiffs' Commercial Accounts "needed to breach or terminate existing" contracts or decline to renew expiring contracts); *compare id.* ¶ 9 (alleging that the "Challenged Conduct"— *i.e.*, the Ordinance as implemented by the Notice—violates the Contracts Clause and tortiously interferes with Plaintiffs' contracts).)  According to Plaintiffs, the Notice shows that Schaumburg had "actual knowledge" of their existing contracts.  (*Id.* ¶ 84; *see also, e.g., id.* ¶¶ 109, 115.)  In

6

addition, the Notice allegedly shows that Schaumburg made "active efforts to force" Plaintiffs' customers to breach their contracts or stop doing business with Plaintiffs. (*Id.* ¶¶ 109, 115.).

Plaintiffs allege that many of their Commercial Accounts did in fact breach their contracts in order "to comply with the Notice." (*Id.* ¶ 44.) Some accounts allegedly terminated their contracts before they had expired. (*Id.* ¶ 45.) Others allegedly terminated their contracts "at the end of their terms, even though they had historically automatically renewed such contracts." (*Id.*) Illustrating the latter, Plaintiffs allege that in October 2016, Remington Place Apartments informed Plaintiff ADS that it was not going to renew its existing contract for fire alarm monitoring services. (Remington Ltr., Ex. L to Am. VC [122-1] at PageID #:1295.) Remington acknowledged that ADS had "provided excellent service . . . over the years" and that the "termination stems solely from" the Ordinance, "which has forced us into compliance." (*Id.*; *see* Am. VC ¶ 48 (quoting same).) "As a direct result of" the Challenged Conduct, Plaintiffs allege, they have lost business with many of their Commercial Accounts in Schaumburg and "will ultimately lose all of their business" there. (*Id.* ¶ 46.)

Plaintiffs allege that the Challenged Conduct is "not reasonably tailored to meet [Schaumburg's] objectives, which could have easily been met through alternative means" that would not have caused Commercial Accounts to terminate or decline to renew their contracts with Plaintiffs. (*Id.* ¶ 7.) For example, Plaintiffs allege that to ensure "timely reporting of [fire alarm system] outages," Schaumburg could have required alarm companies to report on the status of their customers' fire alarm systems "any time Signals were activated." (*Id.* ¶ 54.) Plaintiffs also note that the Exclusive Agreement between NWCDS and Tyco permitted "Covered Agencies to receive Signals" from Commercial Accounts "at their own facilities and retransmit" them to NWCDS. (*Id.* ¶ 57.) According to Plaintiffs, they could have "replicate[d] this retransmission process in conformance with the Ordinance" if Schaumburg had permitted them to do so. (*Id.* ¶ 58.) Further, Plaintiffs allege that the Challenged Conduct diminishes the safety and quality of fire alarm monitoring services. (*See, e.g.*, *id.* ¶ 98.)

Plaintiffs seek a declaratory judgment that the Ordinance, as implemented by the Notice,

violates their rights under the Contracts Clause; tortiously interferes with their contracts; and tortiously interferes with their prospective economic advantage. They also request an order that permanently enjoins Schaumburg from enforcing the Ordinance and an order that restores Plaintiffs' contracts with their Commercial Accounts. In connection with the Contracts Clause claim, Plaintiffs also seek damages for lost profits and lost revenue. Finally, in connection with their claim for restitution, Plaintiffs seek a declaratory judgment that Schaumburg's receipt of the monthly credits from NWCDS causes them damage, and "[a]n award of damages in the amount of the credits received to date as restitution." (*Id.* ¶ 125.)

## DISCUSSION

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the complaint, not the merits of the case. *See, e.g.*, *Bonnstetter v. City of Chicago*, 811 F.3d 969, 973 (7th Cir. 2016). A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must state a claim that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has facial plausibility when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although "detailed factual allegations" are not required, "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. In ruling on a Rule 12(b)(6) motion, the court accepts all well-pleaded facts in a plaintiff's complaint as true and draws all reasonable inferences in the plaintiff's favor. *See, e.g.*, *Bonnstetter*, 811 F.3d at 973.

**A.     Contracts Clause**

The Contracts Clause of the U.S. Constitution "restricts the power of States to disrupt contractual arrangements." *Sveen v. Melin*, 138 S. Ct. 1815, 1821 (2018). It provides that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. CONST. art. I, § 10, cl. 1. "[T]here is just one way to violate the Contracts Clause: legislative action." *Alarm Detection Sys.*, 930 F.3d at 824. A municipal ordinance is legislative action. *See id.* at 822 (citing *St. Paul*

8

*Gaslight Co. v. City of St. Paul*, 181 U.S. 142, 148 (1901)). The courts recognize that states and municipalities must be permitted "to regulate for the public welfare, even if doing so impacts private arrangements." *Alarm Detection Sys.*, 930 F.3d at 822 (citing *U.S. Tr. Co. of New York v. New Jersey*, 431 U.S. 1, 21 (1977)). Thus, to state a claim that a state law or municipal ordinance violates the Contracts Clause, "a plaintiff must plausibly allege that: (1) the state law 'operated as a substantial impairment of a contractual relationship'; and (2) the state law is not drawn in an 'appropriate' and 'reasonable' way that advances [a] 'significant and legitimate public purpose.'" *Alarm Detection Sys.*, 930 F.3d at 822 (internal quotation marks omitted) (quoting *Sveen*, 138 S. Ct. at 1821-22).[7]

Schaumburg argues that Plaintiffs have not sufficiently pleaded that the Ordinance impairs their contractual relationships. The Ordinance, Schaumburg contends, "merely requires a direct connect to NWCDS upon one of several triggering events, and even allows for extensions if existing contracts exceed[] the August 31, 2019 cutoff date." (Def.'s Mot. at 5.) According to Schaumburg, Plaintiffs acknowledge as much by alleging that "the Notice, not the Ordinance, forms the basis for their Contract Clause claim." (*Id.* (citing Am. VC ¶ 6).) Schaumburg maintains that "the Notice is not a municipal ordinance" or other legislative act, and that Plaintiffs therefore have failed to allege that legislative action interfered with their contracts. (Def.'s Mot. at 5.) Schaumburg urges the court to dismiss Plaintiffs' Contract Clause claim on this ground alone. (*See id.* (arguing that the court need not consider whether Plaintiffs sufficiently allege that the Ordinance is not appropriately tailored to achieve a legitimate public purpose).) In assessing this argument, the court is mindful of context from earlier decisions in this case.

In their original complaint, Plaintiffs alleged that the Ordinance and the Exclusive Agreement together require Plaintiffs' Commercial Accounts to breach their contracts for fire alarm

---

[7] Schaumburg cites *Chicago Board of Realtors, Inc. v. City of Chicago*, 819 F.2d 732, 736 (7th Cir. 1987), in which the Seventh Circuit articulated a "three-step inquiry" to determine whether a law violates the Contracts Clause. More recently, the Supreme Court has described the inquiry as having two steps. *See Sveen*, 138 S. Ct. at 1821-22. Substantively, the two- and three-step tests do not differ.

monitoring services.  (*See* Compl. [1] ¶ 116.)   "As such," Plaintiffs alleged, Schaumburg's "conduct substantially and permanently impairs Plaintiffs' existing contractual relationships" in violation of the Contracts Clause.  (*Id.*)  In ruling on the motion to dismiss that complaint, this court determined that Schaumburg "clearly did take legislative action" by passing the Ordinance.  *Alarm Detection Sys., Inc. v. Vill. of Schaumburg*, No. 17 C 2153, 2018 WL 4679559, at *7 (N.D. Ill. Sept. 28, 2018).  Schaumburg argued, as it does here, that "a simple reading of the Ordinance itself demonstrates termination of any contract is not required."  *Id.* (internal quotation marks omitted).  Plaintiffs "appear[ed] to accept that reading of the Ordinance," the court observed.  *Id.*  Specifically, Plaintiffs maintained that the implementation of the Ordinance *by the Notice* is "clearly coercive."  *Id.* (internal quotation marks omitted).  But the court stated that the Ordinance itself "could conceivably impair Plaintiffs' already-existing contracts with customers" if the customers "modify their equipment while still under the contract term, or if the Fire Chief determines that an extension to an existing contract need not be granted to a customer beyond August 31, 2019."  *Id.*  The court did not "definitively determine the substantial impairment issue" because it dismissed the claim on a different ground; in the court's view, Plaintiffs' allegations did not establish that any impairments to its contracts were "unreasonable in light of the public purposes justifying the Ordinance."  *Id.* at *8.

On appeal, the Seventh Circuit stated that the court was correct to "accept[] that" the Ordinance "could amount to a significant impairment on [Plaintiffs'] contractual rights."  *Alarm Detection Sys.*, 930 F.3d at 823.  Where this court had gone astray, the Court of Appeals concluded, was on the question of whether the Ordinance is appropriately tailored to a legitimate public purpose.  *See id.*  The Seventh Circuit explained that "[t]here is no presumption of legislative validity under the Contracts Clause," and that it was "too early to tell" whether "Schaumburg's proffered interests justify the Ordinance and the Notice[.]"  *Id.*  From the Seventh Circuit's perspective, Plaintiffs plausibly alleged that Schaumburg could have achieved its safety goals equally well by taking a different, narrower course.  *See id.*  Plaintiffs, therefore, "pleaded a

plausible Contracts Clause claim against Schaumburg." *Id.*[8]

As this history reflects, Schaumburg has already pressed the theory it advances here—that if anything impaired a contractual relationship, it was the Notice. Both this court and the Court of Appeals rejected that theory, albeit in dicta. The Amended Verified Complaint does differ slightly from the original complaint by, at times, expressly pinning blame for contractual impairments on the Notice. (*See, e.g.*, Am. VC ¶ 4 ("[B]y [the Notice] to all Commercial Accounts, [Schaumburg] required them to terminate their Customer Contracts to contract with Tyco . . . ."); *id.* ¶ 6 ("[T]o comply with the Notice," Plaintiffs' customers "needed to breach or terminate existing" contracts or decline to renew expiring contracts).) Drawing all reasonable inferences in Plaintiffs' favor, however, the Amended Verified Complaint can be understood as alleging that the Notice explains the consequences that necessarily flow from the Ordinance—not that the Notice itself is the change in law that impedes contractual relationships. Plaintiffs make this argument in opposing Schaumburg's motion to dismiss, and it finds support in the pleadings. (*See* Pls.' Opp. to Mot. to Dismiss ("Pls.' Opp.") [136] at 5 ("[T]he Notice interprets and implements the Ordinance to the Commercial Accounts."); *id.* at 4-5 (arguing that the Notice demonstrates how Schaumburg officially construes the Ordinance); Am. VC ¶ 6 (alleging that "[t]he Ordinance as implemented by the Notice" is the conduct that violates the Contracts Clause); Am. VC ¶¶ 9, 81 (similar).)

Understood this way, the Amended Verified Complaint adequately alleges that a legislative action—the Ordinance—impairs Plaintiffs' contractual relationships. And it plausibly alleges that the impairment could be substantial: the Ordinance conceivably requires customers to breach their existing contracts with Plaintiffs if they modify their equipment during the contract term or if the Fire Chief refuses to grant an extension past August 31, 2019.[9] Schaumburg does

---

[8] The Seventh Circuit went on to conclude that Plaintiffs had not "demonstrated a likelihood of success on the merits" of the claim as required to obtain a preliminary injunction. *Id.*

[9] Plaintiffs still do not cite authority providing that an impediment to contract *renewal* constitutes substantial impairment for purpose of the Contracts Clause, *see Alarm Detection Sys.*, 2018 WL 4679559 at *7 n.9, but the court has not rested its decision on that type of impairment.

11

not otherwise challenge the pleadings on the Contract Clause claim. Because Plaintiffs plausibly allege that a legislative act substantially impairs their contractual rights, Schaumburg's motion to dismiss the claim is denied.

**B.    Tortious Interference**

Schaumburg also moves to dismiss Plaintiffs' claims for tortious interference with contract and tortious interference with prospective economic advantage. To state a claim for tortious interference with contract, a plaintiff must allege facts demonstrating "(1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of this contractual relation; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by the defendant's wrongful conduct; and (5) damages." *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill. 2d 145, 154–55, 545 N.E.2d 672, 676, 137 Ill. Dec. 19, 23 (1989) (internal quotation marks omitted). "Inducement to breach a contract involves acts aimed at parties other than a plaintiff and cause those parties to breach a contract held by that plaintiff." *Israel v. Nat'l Canada Corp.*, 276 Ill. App. 3d 454, 464, 658 N.E.2d 1184, 1193, 213 Ill. Dec. 163, 172 (1st Dist. 1995).

To state a claim for tortious interference with prospective economic advantage, a plaintiff must allege facts demonstrating "(1) a reasonable expectancy of entering into a valid business relationship, (2) the defendant's knowledge of the expectancy, (3) an intentional and unjustified interference by the defendant that induced or caused a breach or termination of the expectancy, and (4) damage to the plaintiff resulting from the defendant's interference." *Voyles v. Sandia Mortg. Corp.*, 196 Ill. 2d 288, 300–01, 751 N.E.2d 1126, 1133, 256 Ill. Dec. 289, 296 (2001) (internal quotation marks omitted). As with a claim for tortious interference with contract, a plaintiff must allege that the defendant directed its interference toward a third party. *See, e.g.*, *Douglas Theater Corp. v. Chicago Title & Tr. Co.*, 266 Ill. App. 3d 1037, 1047, 641 N.E.2d 584, 590, 204 Ill. Dec. 360, 366 (1st Dist. 1994).

Schaumburg maintains that both kinds of tortious interference claims require allegations that Plaintiffs have business relationships (or business expectancies) "with specific third parties."

(Def.'s Mot. at 6.) According to Schaumburg, Plaintiffs allege only that they "have an ongoing business relationship with various individuals and businesses in the Village . . . ." (*Id.*) These allegations are conclusory and fail as a matter of law, Schaumburg contends. (*See id.*) In response, Plaintiffs highlight their allegations that they have contracts with Commercial Accounts in Schaumburg. (Pls.' Opp. at 8 (citing Am. VC ¶ 4).) The Amended Verified Complaint defines "Commercial Accounts" as commercial and multi-family buildings. (Am. VC ¶ 2.) In addition, Plaintiffs point to their allegations that their contractual relationships with the Commercial Accounts are often "near permanent," including because the contracts typically contain automatic renewal provisions. (Pls.' Opp. at 8 (citing Am. VC ¶¶ 27, 45).)

Disappointingly, Plaintiffs do not address the cases Schaumburg cites for the proposition that they must identify "specific" third-party business relationships. But the court concludes Schaumburg has overstated its case on this issue. The cases Schaumburg cites on this score state only that the third parties must be "identifiable," not that the allegations must identify them by name. *Schuler v. Abbott Labs.*, 265 Ill. App. 3d 991, 994, 639 N.E.2d 144, 147, 203 Ill. Dec. 105, 108 (1st Dist. 1993); *Suhadolnik v. City of Springfield*, 184 Ill. App. 3d 155, 184, 540 N.E.2d 895, 912, 133 Ill. Dec. 29, 46 (4th Dist. 1989) (discussing commercial disparagement claim). In a case that Schaumburg does not cite, an Illinois appellate court makes this very point. *See Downers Grove Volkswagen, Inc. v. Wigglesworth Imports, Inc.*, 190 Ill. App. 3d 524, 529, 546 N.E.2d 33, 37, 137 Ill. Dec. 409, 413 (2d Dist. 1989) ("Plaintiff must plead facts to show interference of a business relationship with specific third parties or an identifiable prospective class of third persons. . . . This does not mean, however, that plaintiff must allege the identity of the third party or parties by name." (citations omitted)). Here, Plaintiffs adequately allege identifiable third parties with which they have contracts or business expectancies: commercial and multi-family buildings in Schaumburg, some of which have been contracting with Plaintiffs for the relevant services for decades.

Regarding the claim for tortious interference with prospective economic advantage, Schaumburg also contends that Plaintiffs "could have no reasonable business expectancy" in

continued business with their customers because Plaintiffs knew that other communities had passed "direct connect ordinances" like the one challenged here. (Def.'s Mot. at 7.) Schaumburg observes that the Notice mentions such ordinances in "numerous other area communities," and that Plaintiffs have filed several lawsuits challenging similar ordinances. (*See id.*; Def.'s Reply in Supp. of Mot. to Dismiss ("Def.'s Reply") [137] at 4.) Again, the court is not persuaded. Plaintiffs allege that they had decades-long, "near permanent" relationships with many Commercial Accounts in Schaumburg and that their contracts with those customers typically contained automatic renewal provisions. (Pls.' Opp. at 8; *see* Am. VC ¶¶ 4, 27, 45.) In addition, Plaintiffs allege that in more than 150 Northern Illinois jurisdictions, they provide fire alarm monitoring services that do not use direct connections to local 911 centers. (*See* Pls.' Opp. at 9; Am. VC ¶ 25.) These allegations sufficiently plead that Plaintiffs have a reasonable expectation of doing continued business with their customers in Schaumburg.

Regarding both forms of tortious interference claims, Schaumburg next argues that Plaintiffs' allegations do not show that it knew about their existing customer contracts or business expectancies. Schaumburg insists that it enacted the Ordinance to protect public safety, not to interfere with Plaintiffs' customer relationships. And even if the Ordinance does impact Plaintiffs' business, Schaumburg asserts, that is true of many municipal ordinances. (*See* Def.'s Mot. at 7 (noting that in *Greyhound Lines, Inc. v. City of Chicago*, 24 Ill. App. 3d 718, 732, 321 N.E.2d 293, 305 (1st Dist. 1974), the court upheld an ordinance that banned pay-for-use lavatories against a challenge from lavatory coin lock suppliers).) These arguments miss the mark, though, because as Plaintiffs observe, the Ordinance challenged here discusses customers' "existing contracts" with "monitoring agenc[ies]"; states that Commercial Accounts must begin complying with the Ordinance when those contracts end; and lists two other conditions that trigger compliance obligations whether or not the contract terms have expired. (Pls.' Opp. at 8-9 (quoting Ordinance No. 16-078 at PageID #:1270).) The Notice discusses these factors as well (*see* Pls.' Opp. at 9; Notice at PageID #:1289), and Plaintiffs allege that the Notice shows Schaumburg's "actual knowledge" of its customer contracts. (Am. VC ¶ 84; *see also id.* ¶¶ 109, 115.) Schaumburg's

purported purpose for enacting the Ordinance has little relevance to the question of whether it knew about the existing contracts between Plaintiffs and Commercial Accounts. The allegations just discussed plausibly suggest that Schaumburg indeed possessed that knowledge. Furthermore, Plaintiffs' allegation that they served Commercial Accounts in Schaumburg for decades plausibly suggests that Schaumburg knew about their expectations of doing future business with those customers.

Next, Schaumburg contends that Plaintiffs do not plausibly allege that it intended to interfere with their contractual relationships. Schaumburg's arguments on this issue overlap with the ones just discussed. Namely, Schaumburg contends that it enacted the Ordinance to protect public safety, and that even if the Ordinance affects Plaintiffs' business, Schaumburg did not intend for it to have this "secondary impact." (Def.'s Mot. at 7.) Schaumburg also argues that sending the Notice to Customer Accounts cannot reasonably be interpreted as purposeful interference directed at third parties. Plaintiffs counter that the compliance-triggering conditions listed in the Ordinance and Notice plausibly show that Schaumburg intended to interfere with their contracts and future business expectations. As noted above, the Ordinance expressly mentions customers' existing contracts. It can also be read as requiring customers to breach the contracts before they end or barring customers from renewing contracts once they expire. Adding to this, Plaintiffs allege that Schaumburg had a financial motive for enacting the Ordinance: the potential to receive $300,000 to $400,000 in credits from NWCDS. (*See* Pls.' Opp. at 9.) Even assuming Schaumburg's primary purpose for enacting the Ordinance was safety-related, Plaintiffs plausibly allege that Schaumburg also intended to upend customers' existing contractual relationships or prevent their renewal.

Last, Schaumburg maintains that Plaintiffs fail to adequately plead that it "caused a third party not to enter into a business relationship with [Plaintiffs]." (Def.'s Mot. at 7; *see also id.* (arguing that Plaintiffs plead only the "conclusion that [it] 'intentionally' interfered with their expectancy").) Schaumburg cites *OnTap Premium Quality Waters, Inc. v. Bank of Northern Illinois, N.A.*, 262 Ill. App. 3d 254, 263-64, 634 N.E.2d 425, 432, 199 Ill. Dec. 586, 593 (2d Dist.

15

1994), for the boilerplate principle that causation is an element of a tortious interference claim. It provides no analysis of the case. In response, Plaintiffs point to their allegations that, as a result of the Ordinance (which was directed at third parties), many customers terminated their contracts early or declined to renew them when they expired, despite having automatically renewed such contracts in the past. (Pls.' Opp. at 10-11 (citing Am. VC ¶¶ 44-48).) Plaintiffs also provide a concrete example: Remington Place Apartments allegedly told Plaintiff ADS that it was not renewing its contract "solely" because of the Ordinance, which "forced [it] into compliance." (Am. VC ¶ 48 see Pls.' Opp. at 11 (citing same).) Taken as true, these allegations plausibly show that the Ordinance caused Plaintiffs' customers to breach existing contracts or terminate business relationships that Plaintiffs reasonably expected would continue.

For the reasons explained here, the court denies Schaumburg's motion to dismiss Plaintiffs' claims for tortious interference with contract and tortious interference with prospective economic advantage.

**C.    Restitution (Unjust Enrichment)**

In addition to their tortious interference claims, Plaintiffs assert a claim for restitution based on alleged unjust enrichment to Schaumburg. "To state a cause of action based on a theory of unjust enrichment, a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *HPI Health Care Servs.*, 131 Ill. 2d at 160, 545 N.E.2d at 679, 137 Ill. Dec. at 26. "Unjust enrichment is not a separate cause of action under Illinois law." *Horist v. Sudler & Co.*, 941 F.3d 274, 281 (7th Cir. 2019); *see also, e.g.*, *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 517 (7th Cir. 2011) ("[I]f an unjust enrichment claim rests on the same improper conduct alleged in another claim, then the unjust enrichment claim will be tied to this related claim—and, of course, unjust enrichment will stand or fall with the related claim."); *Martis v. Grinnell Mut. Reinsurance Co.*, 388 Ill. App. 3d 1017, 1024, 905 N.E.2d 920, 928, 329 Ill. Dec. 82, 90 (3d Dist. 2009).

Plaintiffs' unjust enrichment theory centers on the $23-per-account monthly credit that

Schaumburg receives against the fees it owes to NWCDS for 911 services. Plaintiffs allege that Schaumburg receives the credit only because of illegal conduct—enacting the Ordinance—and that the credit is therefore an ill-gotten gain. (*See* Am. VC ¶¶ 118-24.) Plaintiffs further allege that Schaumburg retains the benefit to their detriment. (*Id.* ¶ 122.) Plaintiffs seek a declaratory judgment that the credits to Schaumburg cause them damage, and "[a]n award of damages in the amount of the credits [Schaumburg has] received to date as restitution." (*Id.* ¶ 125.)

Schaumburg contends that the court must dismiss this claim because unjust enrichment is not an independent cause of action and, according to Schaumburg, Plaintiffs have not adequately pleaded any other illegal conduct. As discussed above, however, Plaintiffs' Contract Clause and tortious interference claims survive this motion to dismiss, defeating Schaumburg's initial argument for dismissal of the restitution claim.

Schaumburg's second argument for dismissal is more complicated. Schaumburg contends it is immune from liability for the restitution claim under the Illinois Tort Immunity Act. Relevant here, the Act provides that a "local public entity is not liable for an injury caused by adopting or failing to adopt an enactment . . . ." 745 ILCS 10/2-103. An ordinance is an "enactment". 745 ILCS 10/1-203. Thus, Schaumburg argues that it is immune from liability flowing from its passage of the Ordinance. The Act also states that "a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused." 745 ILCS 10/2-201. Schaumburg maintains that, to the extent Plaintiffs challenge the Notice, the Fire Chief sent it while occupying the kind of position described in Section 2-201. The Fire Chief is therefore immune, Schaumburg argues, and by extension, so is Schaumburg. (*See* Def.'s Mot. at 8-9 (citing 745 ILCS 10/2-109 ("A local public entity is not liable for an injury resulting from an act or omission of its employee where the employee is not liable.")).)

Significantly, the Act provides for immunity only against claims for damages. *See* 745 ILCS 10/2-101 ("Nothing in this Act affects the right to obtain relief other than damages against a

17

local public entity or public employee."). In *Raintree Homes, Inc. v. Village of Long Grove*, 209 Ill. 2d 248, 252, 807 N.E.2d 439, 442, 282 Ill. Dec. 815, 818 (2004), cited by Plaintiffs, the defendant-village enacted an ordinance that required developers to pay "impact fees" in exchange for each building permit the village issued to them. The plaintiff-developers sought a declaratory judgment that the ordinance was unlawful and requested a "refund" of the impact fees they had paid to the village. *Id.* at 253, 807 N.E.2d at 442, 282 Ill. Dec. at 818. The court held that the Illinois Tort Immunity Act did not apply to the claim because the claim sought relief "other than damages." *Id.* at 256, 807 N.E.2d at 444, 282 Ill. Dec. at 820 (quoting 745 ILCS 10/2-101). It explained that the plaintiffs sought only the return of fees it had paid to the defendant under the ordinance. *See id.* The plaintiffs did not, for example, request "compensation for the loss of capital which they could have devoted to other investments . . . ." *Id.* at 257, 807 N.E.2d at 445, 282 Ill. Dec. at 821. So if they succeeded on the claim, their award would be "measured by the [defendant's] unjust gain, rather than the plaintiffs' loss." *Id.* The claim, therefore, was "more properly characterized as restitution" than damages. *Id.* at 258, 807 N.E.2d at 445, 282 Ill. Dec. at 821.

Citing *Raintree*, Plaintiffs argue that "the Act does not apply to claims for restitution" and that Schaumburg therefore enjoys no immunity. (Pls.' Opp. at 8.) But Plaintiffs do not discuss the reasoning in *Raintree* nor explain how it applies where, as here, Plaintiffs are requesting money they did not pay to Schaumburg under the Ordinance. Indeed, Plaintiffs ignore Schaumburg's argument that they are improperly seeking to recover credits owed to Schaumburg under a contractual agreement to which Plaintiffs are not party. (*See* Def.'s Mot. at 8; Def.'s Reply at 5.) Schaumburg, for its part, fails to address *Raintree* at all. It urges that Plaintiffs' restitution claim is "nothing more than a claim for damages," but does not develop the point or cite supporting authority. (Def.'s Reply at 5.) In short, the briefing from both sides concerning whether the Illinois Tort Immunity Act shields Schaumburg from the restitution claim is inadequate.

It is not the court's responsibility to do the parties' research or make arguments for them. Because both sides rely on the court to do so, the court dismisses Plaintiffs' restitution claim but

does so without prejudice.

## **CONCLUSION**

For the foregoing reasons, the court grants in part and denies in part Schaumburg's motion to dismiss the Amended Verified Complaint [127]. Schaumburg's motion to dismiss the claims for violation of the Contract Clause, tortious interference with contract, and tortious interference with prospective economic advantage is denied. Plaintiffs' claim for restitution (unjust enrichment) is dismissed without prejudice. Defendant Schaumburg is directed to file its answer to the Amended Verified Complaint on or before April 22, 2021.

ENTER:

Dated: March 29, 2021

_____
REBECCA R. PALLMEYER
United States District Judge