IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ALARM DETECTION SYSTEMS, INC., et al., <br><br> Plaintiffs, <br><br> v. <br><br> VILLAGE OF SCHAUMBURG, <br><br> Defendant. | Case No. 17 C 2153 <br><br> Judge Joan H. Lefkow |

**OPINION AND ORDER**

Plaintiffs are Alarm Detection Systems, Inc., Illinois Alarm Service, Inc., Nitech Fire & Security Industries, Inc., and SMG Security Systems, Inc. ("Alarm Companies"). They are Illinois corporations licensed to provide fire-alarm installation, maintenance, and monitoring services for commercial and multi-family buildings throughout the state of Illinois. Under these licenses, Alarm Companies operate central stations that monitor fire-alarm signals from their customers' properties and relay those signals to the appropriate government emergency-dispatch center.

In 2016, the Village of Schaumburg, Illinois, enacted Ordinance No. 16-078 requiring that all fire-alarm systems for commercial and multi-family properties in the Village operate under a "direct connect system." This meant that all fire-alarm signals from those properties must be directly transmitted to the Village's designated dispatch station, the Northwest Central Dispatch System ("NWCDS"). Because Alarm Companies relayed fire-alarm signals from the properties through their own private "supervising stations," then to NWCDS, their systems did

not comply with the Ordinance. The Ordinance resulted in loss of business and lost profits for Alarm Companies.

Six months after the Ordinance passed, Alarm Companies initiated this lawsuit against the Village, alleging impairment of their contracts with the property owners they currently serviced and seeking both damages and to enjoin enforcement of the Ordinance. They rely on the Contracts Clause of Article I of the Constitution and Illinois common law theories of tortious interference with contract and with prospective economic advantage. Pending now are the parties' cross-motions for summary judgment. For the reasons explained below, the court grants the Village's motion for summary judgment (dkt. 197) and denies the Alarm Companies' cross-motion (dkt. 194).[1]

## BACKGROUND[2]

Alarm Companies provide fire-alarm installation, maintenance, and monitoring services for commercial and multi-family buildings throughout the state of Illinois, their "Commercial Accounts." Alarm Companies have approximately 17,500 Commercial Accounts in more than 150 northern Illinois communities. The Village is a municipal corporation located in Cook County.

---

[1] The case is brought under 42 U.S.C. § 1983 and jurisdiction rests on 28 U.S.C. § 1343.

[2] On summary judgment, the court relies on the factual assertions and objections thereto contained in the parties' Local Rule 56.1 submissions, and it may enforce strict compliance with Local Rule 56.1 procedures. *See Curtis* v. *Costco Wholesale Corp.*, 807 F.3d 215, 219 (7th Cir. 2015); *Stevo* v. *Frasor*, 662 F.3d 880, 886–87 (7th Cir. 2011). Accounting for the parties' objections, what follows are the relevant and properly supported factual assertions, based on the undisputed facts as admitted by the parties or, if an objection to an asserted fact was raised, based on the court's review of the underlying evidence cited in support of or opposition to the fact. *See Omnicare, Inc.* v. *UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011). Thus, if a submitted fact is not included below, it is because it either was immaterial and provided no helpful context or was unsupported by the evidence.

Local fire codes, including those of the Village, require certain commercial and multi-family buildings to be protected by fire-alarm systems and typically require that those systems comply with national safety standards set forth in the National Fire Protection Association's National Fire Alarm and Signaling Code (NFPA 72). Under NFPA 72, the installation and maintenance of fire-alarm systems are the responsibility of individual building owners. Owners of commercial and multi-family properties typically contract with private companies, such as Alarm Companies, to provide and maintain the required fire-alarm systems. Such systems generally have three components: (1) smoke and heat detectors that generate signals; (2) an alarm panel that receives signals from those detectors; and (3) a transmission device that sends signals to a monitoring facility. The signals transmitted by the detectors include alarm signals signifying smoke or fire, as well as "trouble" or "supervisory" signals which indicate whether the system is performing properly or is out of service.

Under NFPA 72, signals from fire-alarm systems must be sent to a receiving point called a supervising station (or "central station"). Private alarm companies, including Alarm Companies, often operate their own supervising stations. NFPA 72 provides that when a private company receives an alarm signal from a Commercial Account to its private supervising station, the alarm company must immediately contact the appropriate 911 communication center or fire department to enable the dispatching of fighters or paramedics. For supervisory and trouble signals, NFPA 72 instructs that the supervising stations promptly notify the relevant property owner of the Commercial Account of the signal, investigate the need for system maintenance, and separately notify the appropriate local fire department or law-enforcement agency. NFPA 72 additionally provides that the supervising station should immediately notify the appropriate authority having jurisdiction over the property if sprinkler or fire-suppression systems have been

wholly or partially out of service for eight hours. NFPA 72 generally permits property owners with fire-alarm systems either to relay signals through a private company's supervising station or to transmit signals directly to local government-run 911 centers using approved wireless transmission devices.

Before 2007, the Village operated under a system by which fire-alarm signals were transmitted directly from commercial and multi-family properties to the Village's in-house 911 call center. In 2007, the Village's in-house 911 call center was transferred to NWCDS, a regional dispatch center that services multiple municipalities and villages. After the transfer of the call center to NWCDS, property owners could choose to have their alarm signals transmitted directly to NWCDS or could opt to have signals relayed through private supervising stations.

From at least 2007 through the adoption of the Ordinance in 2016, Alarm Companies provided fire-alarm services to Commercial Accounts in the Village, including alarm installation and maintenance and signal monitoring. Once their systems received an alarm signal from a Commercial Account property, the signal would be transmitted wirelessly to a supervising station. An operator there would then call NWCDS to notify them of the alarm activation. A dispatcher at NWCDS would then verify the information and enter it into NWCDS's computer-aided dispatch system to dispatch appropriate emergency personnel. The operator at the supervising station would also notify the contact person at the Commercial Account property.

In 2011, NWCDS entered into an exclusive agreement with Tyco Integrated Security, LLC for Tyco to provide and maintain the fire-alarm signal receiving equipment at NWCDS.[3] The agreement gave Tyco exclusive rights to the signal-monitoring and processing systems at

---

[3] Tyco later merged with and became part of Johnson Controls, which is now responsible for the monitoring equipment at NWCDS. The court uses the Tyco name, however, as the parties have generally done so in their briefing and statements of fact.

4

NWCDS. The agreement did not otherwise require NWCDS or users such as Commercial Accounts to employ Tyco's services or equipment at individual properties to generate alarms. Thus, according to the agreement, a Commercial Account that chose to have its alarm signals transmitted directly to NWCDS had to send its signals to Tyco's receiving equipment at NWCDS, but the Commercial Accounts were free to use any private company to install and maintain the systems and detectors that generated the signals at their properties.

Irrespective of the agreement, there is a dispute about whether a Commercial Account that wished to use direct monitoring was required to rely only on Tyco to install wireless transmission equipment. Regardless, at least until the Ordinance was adopted in 2016, Commercial Accounts could still contract with companies like Alarm Companies to have signals relayed to NWCDS via a private supervising station.

In late 2014 Fire Department officials began noticing that fire-alarm systems had fallen out of service without notice having been given to the Village, so the Village began tracking these events. At a public-safety committee meeting on January 15, 2016, the Fire Chief reported that the Department had encountered 18 such occurrences over the previous 15 months. Included were five instances in the three months prior to the meeting that involved two restaurants, a night club, a factory, and a school. The minutes from the January 2016 meeting reflect that, through quarterly inspections, the Village had been consistently identifying three to five businesses with out-of-service systems about which the Village had received no notice, causing concern for public safety. Fire Department officials indicated that they would continue to monitor the issue.

On July 25, 2016, the Fire Chief sent a memorandum to the public-safety committee recommending a change to the Village Code that would require all fire-alarm systems to connect directly to the Schaumburg 911 center at NWCDS. In the memorandum, the Fire Chief noted

that the Village Code had required direct connection before the 911 center had been transferred to NWCDS in 2007. While the Village had allowed property owners to subscribe to private alarm-monitoring services after 2007, the Fire Department was now recommending a return to the pre-2007 requirement of direct connection. According to the Fire Chief, the change would "reduce fire-department response times by eliminating an entire step in the process [and] … routing alarm signals directly to 911." That extra step, the Fire Chief said, was, in some instances, creating delays in alarm-signal notification that exceeded code requirements by several minutes.

The memorandum also addressed the issue, previously raised in the January meeting, that during inspections building alarm systems were found to be out of service without any notice having been given to the Village.[4] The Fire Chief observed that the Fire Department had been closely monitoring the issue for the previous 18 months, had found 29 businesses with various signal or maintenance issues, and had concluded that there were likely "many more additional problematic systems of which we are unaware."

Ultimately, the Fire Chief believed the change would both reduce response times and assure that supervisory or trouble signals would be received at NWCDS, which could also ensure that building owners and fire departments would be made aware of system problems. An

---

[4] Alarm Companies dispute the Village's contention that fire-alarm systems were regularly being found to be out of service without notification to the Village of any trouble or supervisory signals. But while Alarm Companies provide lengthy explanations and citations to record evidence, the facts and evidence they point to do not actually controvert the substance of the Village's claims that alarms were being discovered out of service. For example, Alarm Companies repeatedly respond to the Village's statement of facts that they were not required under NFPA 72, a Village ordinance, or NWCDS policy, to contact the Village or NWCDS about any supervisory or trouble signals under the Village code, but they generally complied with the requirements of NFPA 72 and "typically" or "routinely" restored service on the same or following day when they received trouble or supervisory signals at their supervising stations. But "routine" or "typical" practices and capabilities do not create any genuine disputes with the Village's evidence that the Fire Department was discovering *specific instances* of out-of-service systems about which the Village had received no notice.

additional benefit, the Fire Chief stated, was that the Village would receive a credit off its subscription fees to NWCDS of approximately $23 per month per property owner that contracted with NWCDS for direct monitoring. The Fire Chief estimated that these credits would result in between $300,000 and $400,000 in revenue coming back to the Village, which revenue could be used for a variety of capital projects, services, programs, or tax relief. Alternatively, the Village could waive the credits to reduce the monitoring fees charged to businesses.

The Village adopted the Fire Chief's recommendation and, on August 23, 2016, enacted Ordinance No. 16-078, which mandated a return to direct-connect alarm monitoring. The stated purpose of the Ordinance was that "public safety would be best served to require a supervising station through [NWCDS] due to our experience with alarms being out of service which endangers the health, safety and welfare of the general public."

The Ordinance set a series of trigger dates for when existing systems would be required to switch to a direct connection: (1) when an existing contract with a monitoring agency ends; (2) when the existing fire-alarm equipment is modified or replaced; or (3) by August 31, 2019, at the latest. Property owners could seek further extensions of existing contracts beyond August 2019 and through 2021, at the latest, provided that the Fire Chief determined that the public safety would not be affected.[5]

On September 27, 2016, the Village sent a notice to all fire-alarm users regarding the passage of the Ordinance outlining what the Village believed were the benefits of a direct-connection system, including increased reliability of alarm systems, elimination of signal delays,

---

[5] In 2018, the Village passed an additional ordinance, No. 18-011, which repealed and amended other portions of the Ordinance No. 16-078. (*See* dkts. 206 ¶ 24; 122-1 at 32.) The 2018 ordinance was substantively the same as the 2016 ordinance, however, with respect to the provisions at issue in this case. The court therefore continues to refer to the 2016 version even though Alarm Companies challenge both the 2016 and 2018 ordinances.

and faster response times. The notice further stated that Tyco was the authorized installer of the radio equipment required for fire-alarm systems monitored by NWCDS.

The parties present starkly different narratives regarding the Ordinance's impact on fire-alarm monitoring in the Village. The Village asserts that, with the change to direct connect, the Village now gets daily reports from NWCDS about systems that are experiencing problems, and it has never found a fire-alarm system to be out of service or in supervisory or trouble condition without NWCDS having been notified. The Village states, moreover, that it now can follow up with property owners to see that issues are resolved. In 2018, the Village conducted a comparison study of signal response times for properties before and after the transition to direct monitoring at NWCDS. The study revealed a significant decrease (between one-and-a-half and two minutes) in response times after the properties had transitioned to NWCDS monitoring.[6]

Alarm Companies, on the other hand, state that the Ordinance caused their Commercial Accounts either to breach their contracts by terminating early or refused to renew at the expiration of their terms, causing Alarm Companies to lose the business of more than 250 Commercial Accounts in the Village. Alarm Companies contend that the Ordinance required these Accounts to contract with Tyco because the Village had designated Tyco as the sole provider of monitoring and alarm systems.

The Village acknowledges that Alarm Companies lost business in the Village but denies that the Ordinance required the cancellation or termination of any contracts. As the Village sees it, the Ordinance merely mandated a direct connection to NWCDS on certain trigger dates, such as the expiration of a contract or the installation of new equipment. The Ordinance even allowed

---

[6] Alarm Companies dispute a number of the Village's contentions with respect to the impact of the Ordinance on alarm monitoring in the Village. Once again, however, Alarm Companies' purported "disputes" merely amount to lengthy lists of unrelated factual claims that do not directly contradict the Village's contentions.

for extensions of existing contracts past the August 2019 deadline. The Village further disputes that the Ordinance requires Commercial Accounts to contract with Tyco; rather, the Ordinance requires only that properties transmit fire-alarm signals directly to NWCDS, regardless of the specific vendor chosen to service or maintain alarm equipment at particular properties.

## I.     Procedural History

This case was before the Seventh Circuit on Alarm Companies' appeal from dismissal of the federal claims and relinquishment of jurisdiction over the state-law claims against the Village. *Alarm Detection Sys., Inc.* v. *Village of Schaumburg*, 930 F.3d 812 (7th Cir. 2019). The Court of Appeals remanded only for consideration of Alarm Companies' Contracts Clause claim, instructing that they should be given the opportunity to present proof. Although a win for Alarm Companies on dismissal of the claim, the court denied the appeal for injunctive relief because Alarm Companies had not shown likelihood of success on the merits. *Id*. at 823. After remand and additional litigation, the Contract Clause claim and two tortious interference claims remain against the Village, to which the pending motions are directed.

## II.    Standard of Review

A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Genuine disputes of material fact are not demonstrated by the "mere existence of some alleged factual dispute between the parties[,]" *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) (emphasis omitted), or by "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine dispute of material fact exists "if the evidence is such that a reasonable [factfinder] could return a verdict" for the nonmovant. *Anderson*, 477 U.S. at 248.

9

The ordinary standards for summary judgment remain unchanged on cross-motions for summary judgment: the court must "construe all facts and inferences arising from them in favor of the party against whom the motion under consideration is made." *Blow* v. *Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017). As always, however, the court makes "only reasonable inferences, not every conceivable one." *Spitz* v. *Proven Winners N. Am., LLC*, 759 F.3d 724, 730 (7th Cir. 2014); *Nichols* v. *Mich. City Plant Plan. Dep't*, 755 F.3d 594, 599 (7th Cir. 2014) (nonmovant "not entitled to the benefit of inferences that are supported by only speculation or conjecture") (cleaned up). Importantly, the mere "existence of cross-motions for summary judgment does not . . . imply that there are no genuine issues of material fact." *R.J. Corman Derailment Servs., LLC* v. *Int'l Union of Operating Eng'rs*, 335 F.3d 643, 647 (7th Cir. 2003).

### III. Contracts Clause

The Contracts Clause "'restricts the power of States to disrupt contractual arrangements' through legislative action[] … [a]nd applies equally to municipal ordinances[]" enacted by local government entities. *See Alarm Detection Sys., Inc.*, 930 F.3d at 822 (quoting *Sveen* v. *Melin*, 584 U.S. 811, 818 (2018)). To succeed on a Contracts Clause claim, a plaintiff must establish that (1) "the state law operated as a substantial impairment of a contractual relationship; and (2) the state law is not drawn in an appropriate and reasonable way that advances significant and legitimate public purpose." *Id.* (cleaned up).

The substantial impairment element is "context specific[,]" meaning that the court must consider "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating [its] rights." *Alarm Detection Sys., Inc.*, 930 F.3d at 822 (quoting *Sveen*, 584 U.S. at 819). "The second element, like many questions in constitutional law, requires a tailoring assessment. 'The

10

severity of the impairment measures the height of the hurdle the state legislation must clear.'" *Id.* (quoting *Allied Structural Steel Co.* v. *Spannaus*, 438 U.S. 234, 245 (1978)).

Alarm Companies' claim fails at the first element. Alarm Companies argue that there is no genuine dispute of fact that the Ordinance caused many Commercial Accounts either to terminate or to refuse to renew their contracts, costing Alarm Companies hundreds of accounts in the Village. Alarm Companies' argument, however, has no support in the evidentiary record. They fail to point to any evidence that any Commercial Account actually terminated early or otherwise breached a contract in response to the Ordinance. Although Alarm Companies cite such allegations in their Amended Complaint, allegations are not admissible evidence that can create a factual dispute capable of defeating summary judgment. *See Gen. Ins. Co. of Am.* v. *Clark Mall Corp.*, No. 08 C 2787, 2010 WL 2901788, at *5 (N.D. Ill. July 26, 2010) (collecting cases); Fed. R. Civ. P. 56(c) (defining acceptable evidence for a summary judgment motion). Their evidence is only that numerous Commercial Accounts notified them that they would not *renew* their contracts, but declining to renew is simply not the same thing as cancelling an existing agreement.

As the Seventh Circuit observed,

> The Contracts Clause, as we have said before, is concerned with the "taking away" of "entitlements that predated the change" in legislation. In this case, however, many contracts will simply not be renewed—not prematurely canceled—which makes it less likely that the Companies have a reasonable expectation in those contracts after the Ordinance's August 2019 cutoff date. The Ordinance, moreover, not only allows for a three-year window from its enactment to its effective date; it also permits accounts with contracts expiring after the August 2019 cutoff to seek an extension. This, then, is not a case of a "sudden, totally unanticipated, and substantial[ly] retroactive" change in the law, with which the Contracts Clause is most concerned.

*Alarm Detection Sys., Inc.*, 930 F.3d at 823–24 (citations omitted). It may be true that Alarm Companies' Commercial Accounts would have renewed but for the Ordinance, but Alarm

Companies have not demonstrated that they had any entitlement or vested right in these future renewals at the time the Ordinance was passed. *See AFSCME Loc. 818* v. *City of Waterbury*, 389 F. Supp. 2d 431, 436 (D. Conn. 2005) (state statute that imposed binding arbitration on city contracts with unions did not violate Contracts Clause because prior, expired collective-bargaining agreements did not establish any vested rights or entitlements to certain benefits in future contract negotiations), *aff'd sub nom. AFSCME Loc. 818 Waterbury City Emps. Ass'n* v. *City of Waterbury*, 198 F. App'x 47 (2d Cir. 2006); *Frazier* v. *City of Chattanooga*, 151 F. Supp. 3d 830, 837 (E.D. Tenn. 2015) (city did not violate Contracts Clause by altering cost-of-living adjustment in certain public-employee benefits because employees had not shown a vested and contractually enforceable right to such cost-of-living increases), *aff'd sub nom. Frazier* v. *City of Chattanooga*, 841 F.3d 433 (6th Cir. 2016). In short, the Ordinance is simply not the kind of legislative action with which the Contracts Clause is concerned. *See Alarm Detection Sys., Inc.*, 930 F.3d at 823–24.

Because Alarm Companies have failed to come forth with admissible evidence to demonstrate a dispute of fact as to substantial impairment,[7] the court concludes that, as a matter

---

[7] The court acknowledges that there is record evidence to support Alarm Companies' contentions that the Ordinance had the effect of requiring Commercial Accounts to purchase or lease from Tyco at least some equipment necessary to connect to NWCDS. The Village itself seems to have suggested to businesses that Tyco transmitters may be required; after passage of the Ordinance, the Village sent a notice to property owners indicating that Tyco was "the authorized installer of the radio equipment required for fire alarm systems monitored by NWCDS." The notice went on to describe the costs of installing and leasing such wireless transmission equipment from Tyco. Thus, while the court can fairly say that it is undisputed that the Ordinance did not mandate any particular alarm company install and maintain the first two components of fire-alarm systems of Commercial Accounts—the detectors that generate alarm signals and the panel that collects them—there is some dispute as to whether property owners would also need to purchase Tyco radio transmitters to relay those signals directly to NWCDS.

Taken in Alarm Companies' favor, these disputed facts do not point to the conclusion that the Ordinance substantially impaired Alarm Companies' contracts. The Contracts Clause is not violated every time a municipality passes legislation that affects a business model or causes a loss of future business. Because the Ordinance neither required the immediate cancellation or termination of any contracts nor

of law, the Ordinance did not substantially impair Alarm Companies' contracts. The Village is therefore entitled to summary judgment on this claim and Alarm Companies' cross-motion must be denied.

### IV. Tortious Interference with Contract and Prospective Economic Advantage

Having found that Alarm Companies' claim under the Contracts Clause fails as a matter of law, the court may relinquish jurisdiction over the remaining state-law claims, as it did on the first round of dispositive motions. *See*, *e.g.*, *Al's Serv. Ctr.* v. *BP Prods. N. Am., Inc.*, 599 F.3d 720, 727 (7th Cir. 2010) ("When all federal claims in a suit in federal court are dismissed before trial, the presumption is that the court will relinquish federal jurisdiction over any supplemental state-law claims."). The parties' briefing does not address the prudence of retaining supplemental jurisdiction, but they argue the merits. Because this case has been pending for more than seven years, and because the first tortious interference claim rests on the same facts as the Contracts clause claim, the court exercises its discretion to retain jurisdiction over the state-law claims. See 28 U.S.C. §1367.

Under Illinois law, a claim for tortious interference with contract requires a plaintiff to establish five facts: "(1) a valid contract, (2) defendant's knowledge of the contract, (3) defendant's intentional and unjustified inducement of a breach of the contract, (4) a subsequent breach of contract caused by defendant's wrongful conduct, and (5) damages." *Webb* v. *Frawley*, 906 F.3d 569, 577 (7th Cir. 2018); *see also HPI Health Care Servs., Inc.* v. *Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 676 (Ill. 1989). Similarly, a claim for tortious interference with prospective economic advantage requires a plaintiff to establish "(1) a reasonable expectancy of entering into a valid business relationship, (2) the defendant's knowledge of the expectancy, (3) an intentional

---

took away any vested contractual rights, any disputes about the wireless transmitters are insufficient to disturb the court's ultimate conclusion that there was no substantial impairment as a matter of law.

13

and unjustified interference by the defendant that induced or caused a breach or termination of the expectancy, and (4) damage to the plaintiff resulting from the defendant's interference." *Foster* v. *Principal Life Ins*. Co., 806 F.3d 967, 971 (7th Cir. 2015) (quoting *Voyles* v. *Sandia Mortg. Corp.*, 751 N.E.2d 1126, 1133 (Ill. 2001)).

The tortious interference with contract claim fails for the reasons stated in the discussion of the Contracts Clause: there is no evidence that the Village interfered with any existing contract. There is evidence, however, that Alarm Companies had a reasonable expectancy of entering a valid business relationship with its long-standing customers and that the Village knew that when it enacted the Ordinance. Thus, Alarm Companies must show at least a dispute of material fact that would permit an inference that the Village passed the Ordinance to induce Commercial Accounts not to renew contracts with Alarm Companies. *See Brinley Holdings Inc.* v. *RSH Aviation, In*c., 580 F. Supp. 3d 520, 543 (N.D. Ill. 2022) ("A tortious interference claim requires … some active persuasion, encouragement, or inciting that goes beyond merely providing information in a passive way.") (cleaned up); *R.E. Davis Chemical Corp.* v. *Diatonic, Inc.,* 826 F.2d 678, 687 (7th Cir. 1987) ("[T]he element of 'inducement' in the context of a claim for intentional interference with contractual relations requires more than the knowledge that one's conduct is substantially certain to result in one party breaking its contract with another."), *modified on other grounds,* 924 F.2d 709 (7th Cir. 1991 *See generally* Restatement (Second) of Torts § 766 cmt. h (Am. Law. Inst. 1979) ("The essential thing is the intent to cause the result. If the actor does not have this intent, his conduct does not subject him to liability under this rule even if it has the unintended effect of deterring the third person from dealing with the other."). It is not enough to establish that the Village acted with the knowledge that it was likely or substantially certain that breaches would occur or that Commercial Accounts would refuse to

14

renew their contracts. *See, e.g.*, *R.E. Davis Chemical Corp.,* 826 F.2d at 687. Nor can Alarm Companies succeed by showing that the Village engaged in conduct that had a negative downstream impact on a plaintiff's contracts. *See Cohen* v. *Lewis*, No. 03 C 5454, 2004 WL 2481015, at *7 (N.D. Ill. Nov. 3, 2004).

      The Village has proffered abundant evidence, as set out above, to demonstrate that it was not motivated to injure Alarm Companies; rather, its motivation was to improve fire safety in the Village. Alarm Companies argue that the Village had no legitimate public safety justification for the Ordinance since it has not resulted in a decrease in out-of-service alarm systems or faster response times. They argue, moreover, that they also are capable of providing the real-time information and response times the Village purportedly sought in enacting the Ordinance. They also contend that the Village enacted the Ordinance solely to create a new revenue stream for the Village (via credits the Village would receive from NWCDS for every property signing up for direct monitoring).

      Unfortunately, Alarm Companies do not counter with data the Village's evidence that, post passage, response times improved and out-of-service systems decreased. But even if they had, it would not undermine the evidence of the Village's motivation at the time the Ordinance was passed. And even if the Village's primary motive was to avail itself of Tyco's offer of financial benefit to the Village, such is not evidence that the Village wanted to force Commercial Accounts to discontinue their relationships with Alarm Companies. *See Zeigler Auto Grp. II, Inc. v. Chavez*, No. 19 C 2748, 2020 WL 231087, at *9 (N.D. Ill. 2020) ("Merely pointing to passive conduct that the defendant knows is likely to benefit him or her is insufficient.").

      In light of the evidence that the Village pursued legitimate public safety goals in enacting the Ordinance and the paucity of evidence that it intended to induce Commercial

Properties to discontinue contracting with Alarm Companies, the court concludes that no reasonable jury would find that the Village's purpose was to induce property owners to cease doing business with Alarm Companies.

## **CONCLUSION AND ORDER**

For the foregoing reasons, the Village's motion for summary judgment (dkt. 197) is granted, and Alarm Companies' cross-motion for summary judgment (dkt. 194) is denied. The Clerk is directed to enter judgment in favor of the Village of Schaumburg on all claims.

Date: August 14, 2024

_____
U.S. District Judge Joan H. Lefkow